[No. D053345. Fourth Dist., Div. One. Mar. 15, 2010.]

MHC FINANCING LIMITED PARTNERSHIP TWO, Plaintiff and Appellant, v.
CITY OF SANTEE, Defendant and Respondent.

[No. D054298. Fourth Dist., Div. One. Mar. 15, 2010.]

CITY OF SANTEE, Plaintiff, Cross-defendant and Respondent, v.
MHC FINANCING LIMITED PARTNERSHIP TWO, Defendant, Cross-complainant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of part IIB.

**COUNSEL**

Robie & Matthai, Steven S. Fleischman; Jenner & Block, David J. Bradford and Bradley M. Yusim for Plaintiff and Appellant and for Defendant, Cross-complainant and Appellant.

Best, Best & Krieger, James B. Gilpin, Melissa W. Woo and Matthew L. Green for Defendant and Respondent and for Plaintiff, Cross-defendant and Respondent.

**OPINION**

**IRION, J.**—Appellant MHC Financing Limited Partnership Two (MHC) owns and operates a mobilehome park (the Park) in the City of Santee (the City). This consolidated appeal arises out of two lawsuits concerning the City's mobilehome rent control ordinances.

The first lawsuit, filed by MHC against the City (the MHC Action), was the subject of a previous appeal in which we remanded to the superior court with directions that it determine whether MHC is entitled to recover damages from the City. (*MHC Financing Limited Partnership Two v. City of Santee* (2005) 125 Cal.App.4th 1372, 1399 [23 Cal.Rptr.3d 622] (*MHC*).) The second lawsuit (the City of Santee Action) involves (1) a complaint filed by the City against MHC, in which it seeks, among other things, restitution on behalf of the Park's tenants; and (2) a cross-complaint by MHC against the City alleging, among other things, that the City's mobilehome rent control ordinances constitute an unconstitutional taking of private property and violate the right to substantive due process.

MHC's appeal in the MHC Action challenges the trial court's ruling that MHC is not entitled to damages based on the issues that we specified in our

remand directive. MHC's appeal in the City of Santee Action challenges (1) the trial court's ruling sustaining a demurrer to MHC's allegations that the City's ordinances effected a private and physical taking of private property; (2) the trial court's order granting summary judgment in favor of the City on all of the causes of action in MHC's amended cross-complaint; and (3) the trial court's ruling granting summary adjudication in favor of the City on its causes of action seeking restitution and an accounting on behalf of the Park's tenants.

As we will explain, in the published portion of our opinion we conclude that the trial court in the MHC Action properly ruled that MHC was not entitled to damages, and we accordingly affirm the judgment in that action. With respect to the City of Santee Action, in the unpublished portion of our opinion we reverse in part and affirm in part. Specifically, we conclude that the trial court erred in granting summary adjudication in favor of the City on its causes of action seeking restitution and an accounting on behalf of the Park's tenants, but in all other respects, we affirm the judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND

A. *The City's Rent Control Ordinances*

Prior to November 27, 1998, the City's municipal code regulated the rents charged by mobilehome park owners through ordinance No. 324, as amended by ordinance No. 329 (collectively, Ordinances 324/329).

In 1998 a member of a group of mobilehome owners, acting under Elections Code section 9201 et seq., submitted to the City an initiative petition for a new mobilehome rent control ordinance. (*MHC, supra*, 125 Cal.App.4th at p. 1377.) Less than a month later, another member submitted a modified version of the initiative. (*Ibid.*) After a petition containing the modified initiative was circulated and signed by more than 10 percent of the City's registered voters, the city council chose, pursuant to Elections Code section 9215, to adopt the proposed ordinance, which was codified as ordinance No. 381 and became effective on November 27, 1998. (*MHC*, at p. 1378.) However, the city council inadvertently adopted the form of the ordinance proposed in the *original* initiative instead of the form of the ordinance proposed in the *modified* initiative. (*Ibid.*)

In January 2001, after becoming aware of the error, the city council enacted ordinance No. 412, which stated that the text of ordinance No. 381 was corrected to contain the text of the ordinance set forth in the modified

initiative circulated in 1998, and that the correction was made retroactive to the effective date of ordinance No. 381. (*MHC, supra*, 125 Cal.App.4th at pp. 1378–1379.) The City began enforcing ordinance No. 412 on February 23, 2001. (125 Cal.App.4th at p. 1379.)

## B. *The MHC Action*

MHC filed a lawsuit against the City (the MHC Action). The MHC Action asserted, among other things, (1) a claim that the City had violated the Elections Code due to the city council's mistake in adopting the wrong text for ordinance No. 381 and attempting to correct the error by enacting ordinance No. 412; and (2) a claim that certain provisions of ordinance No. 381 and ordinance No. 412 violated MHC's right to petition the government for a redress of grievances as guaranteed by article I, section 3, subdivision (a) of the California Constitution (hereafter, article I, section 3(a)).[1]

On June 6, 2003, the trial court ruled, among other things, that ordinance No. 381 and ordinance No. 412 were void because the City had not complied with the Elections Code, and that certain provisions of the ordinances (hereinafter, the Unconstitutional Provisions) violated MHC's right to petition under the California Constitution.[2] Addressing the remedy for the City's violation of the Elections Code, the trial court stated that "[t]he remedy of future rent increases, as opposed to an award of damages, will adequately compensate MHC. This remedy will place the cost of compensating MHC on those tenants who benefited from the invalid rent control ordinance."

The City appealed the ruling declaring ordinance No. 381 and ordinance No. 412 to be void because of noncompliance with the Elections Code, but it did not take issue with the trial court's ruling that the Unconstitutional

---

[1] MHC's allegation that ordinance No. 381 and ordinance No. 412 violated its right to petition the government for a redress of grievances was based on provisions in those ordinances (1) requiring a mobilehome park owner to pay a fee when applying for a rent adjustment, which may be recovered as a legitimate operating expense only if the adjustment is granted; and (2) providing that in certain instances when a mobilehome park owner unsuccessfully applies for rent adjustment, it must pay the attorney fees incurred by homeowners in opposing the application. MHC's complaint stated that it was seeking declaratory relief with respect to the City's alleged violation of its right to petition, and did not purport to seek damages in connection with that cause of action.

[2] The trial court stated that ordinances Nos. 381 and 412 "impermissibly restrict and chill mobilehome park owners' exercise of their rights to utilize the process" of seeking a rent adjustment.

Provisions violated MHC's right to petition under the California Constitution. (*MHC, supra*, 125 Cal.App.4th at pp. 1381, 1391.) In January 2005 we reversed in part, concluding that the city council properly enacted ordinance No. 412 and made it retroactively effective to cure the defects in ordinance. No. 381. (*MHC*, at p. 1381.) We remanded with the following instructions: "The matter is remanded for further proceedings to determine (1) whether MHC suffered any legally remediable injury as a result of any differences between Ordinance 412 and Ordinance 381 and the retroactive application of Ordinance 412 to the effective date of Ordinance 381; (2) whether MHC suffered any legally remediable injury as a result of enforcement of any of the provisions in Ordinances 381 and 412 that the court found to be unconstitutional; and (3) the proper remedy for any such injury." (*Id.* at p. 1399.)

On remand the trial court conducted a bench trial on the issues specified in our opinion and issued a lengthy statement of decision.

In considering the first issue, the trial court extensively reviewed each of the differences between ordinance No. 412 and ordinance No. 381 that MHC had relied on for its damages argument, and it concluded that MHC had not established any injury from the retroactive application of ordinance No. 412 to the time period between the enactment of ordinance No. 381 and ordinance No. 412.[3]

In considering the second issue (i.e., whether MHC suffered any legally remediable injury as a result of enforcement of the Unconstitutional Provisions in violation of MHC's right to petition), the trial court made a two-part ruling.

As the first part of its ruling, the trial court held that MHC was limited to declaratory and injunctive relief to remedy the violation of its right to petition under article I, section 3(a). In support of this conclusion, the trial court cited decisions of our Supreme Court holding that a plaintiff may not recover damages as a remedy for an infringement of its right to free speech or a due process liberty interest arising under the California Constitution. (*Degrassi v. Cook* (2002) 29 Cal.4th 333 [127 Cal.Rptr.2d 508, 58 P.3d 360] (*Degrassi*) [free speech]; *Katzberg v. Regents of University of California* (2002) 29

---

[3] The trial court rejected MHC's attempt to broaden the first issue we specified in our remand order to encompass "injury arising out of . . . the City's purported retroactive application of [ordinance] No. 412 in December 2005." The trial court explained that "the Court of Appeal was concerned about the impact on MHC of Ordinance 412 versus Ordinance 381," and thus the scope of the remand was, as we described, limited to determining "whether the retroactive application of Ordinance 412 to the effective date of Ordinance 381 interferes with antecedent rights MHC enjoyed under Ordinance 381." (*MHC, supra*, 125 Cal.App.4th at p. 1396.) We agree with the trial court's understanding of our prior opinion.

Cal.4th 300 [127 Cal.Rptr.2d 482, 58 P.3d 339] (*Katzberg*) [due process liberty interest].)[4] In short, consistent with our remand directive, the trial court concluded that any injury MHC might have suffered as a result of the violation of its right to petition was not *legally remediable* through an award of damages.

As a second and independent basis for its ruling, the trial court reviewed the evidence presented at trial and concluded that, even if a violation of MHC's right to petition was legally remediable through an award of damages, MHC had not established it had suffered any injury. The trial court reasoned that because the effect of the Unconstitutional Provisions was to chill MHC's ability to petition the City for a rent adjustment, it would have to determine whether MHC *would have* obtained a rent adjustment if it *had* filed a rent adjustment application with the City's Manufactured Home Fair Practices Commission (the Commission). The trial court then concluded that the Commission would not have granted MHC a rent adjustment had it applied for one during the period the Unconstitutional Provisions were in effect and, accordingly, MHC suffered no injury from the Unconstitutional Provisions.[5]

---

[4] In its ruling, the trial court rejected MHC's attempt to expand the issues on remand to encompass additional challenges to the constitutionality of the City's rent control ordinances. The trial court explained that MHC could not reopen the issues "to challenge the constitutionality of additional provisions of Ordinance 412, or any related provisions contained in [the ordinances enforced by the City before Ordinance 412 took effect]." In our view, the trial court properly understood the limited scope of the issues before it on remand and correctly limited itself to the issues that we specified in our prior opinion. (*Butler v. Superior Court* (2002) 104 Cal.App.4th 979, 982 [128 Cal.Rptr.2d 403] ["When an appellate court's reversal is accompanied by directions requiring specific proceedings on remand, those directions are binding on the trial court and *must* be followed. Any material variance from the directions is unauthorized and void."]; *Hampton v. Superior Court* (1952) 38 Cal.2d 652, 655 [242 P.2d 1] ["When there has been a decision upon appeal, the trial court is reinvested with jurisdiction of the cause, but only such jurisdiction as is defined by the terms of the remittitur. The trial court is empowered to act only in accordance with the direction of the reviewing court; action which does not conform to those directions is void."].)

[5] MHC contends that the trial court, on remand, also ruled that "[i]ndependent of violating the right to petition, the City's enforcement of the [Unconstitutional Provisions] violated MHC's constitutional right to receive a fair return and its right to [rent adjustments] under the Ordinance." Put another way, MHC claims that, as part of the remand proceeding, the trial court ruled that ordinances Nos. 381 and 412 were constitutionally defective in other respects. The trial court made no such ruling. As we have explained, the trial court emphasized that the limited scope of our remand directive did not permit it to consider additional constitutional challenges to the City's mobilehome rent control ordinances. As the trial court correctly understood, the only issue before the trial court concerning the Unconstitutional Provisions was whether MHC incurred any legally remediable injury as a result of the violation of MHC's right to petition for a redress of grievances.

## C. *The City of Santee Action*

### 1. *Background*

In September 2003, after the trial court in the MHC Action ruled that ordinance No. 381 and ordinance No. 412 were void, the City sent a notice to mobilehome park owners, including MHC, stating that the annual permissive rent adjustment for 2004 should be calculated based upon the former mobilehome rent control provision, Ordinances 324/329, which allowed an adjustment of 100 percent of the San Diego consumer price index (CPI), instead of 70 percent of the CPI as would have been permitted by ordinances Nos. 381 and 412.[6] The notice stated that "[i]f the appellate court reverses the trial court's decision, the [City] reserves its right to recoup and refund to tenants the difference between the one hundred percent of the average rate change in the [CPI] and the annual permissive adjustment permitted under Ordinances 381/412."

MHC then sent a notice to tenants in the Park, advising them that not only would MHC implement the permissive annual rent adjustment allowed by the City, but that effective January 1, 2004, (1) mobilehome park tenants would incur a one-time charge of $920.12, representing "the additional rent that would have been collected pursuant to Ordinance Nos. 324/329 for the period November 2000 to the effective date [of the trial court's judgment] if those Ordinances had been in effect"; and (2) the base rent at the Park would increase to $708.21, representing "the base rent which would have existed had Ordinance Nos. 324/329 had [*sic*] been effective and enforced instead of Ordinance Nos. 381/412."

### 2. *The City's Original and Amended Complaint*

After MHC rejected a request by the City that it rescind its notice of the rent increases, the City filed a lawsuit against MHC in December 2003 to enjoin it from collecting any rent increase other than the annual permissive rent adjustment for 2004 (the City of Santee Action).[7] The trial court denied the City's request for a preliminary injunction, and MHC implemented the two-part rent increase described in its notice to the Park's tenants.

In December 2005, after we reversed the trial court's ruling in the MHC Action and thereby established that ordinance No. 412 was retroactively

---

[6] More specifically, Ordinances 324/329 allowed annual permissive rent increases equal to 100 percent of the increase in the CPI, and ordinances Nos. 381 and 412 allowed annual permissive rent increases equal to 70 percent of the increase in the CPI where the increase is 3 percent or less, plus 40 percent of the portion of the CPI increase that is greater than 3 percent but less than 8 percent.

[7] The City took the position that the two-part rent increase described in MHC's notice to the Park's tenants was not permitted under Ordinances 324/329.

effective to the date of the enactment of ordinance No. 381 (*MHC, supra*, 125 Cal.App.4th 1372), the City amended its complaint to include causes of action for (1) "Recovery of Amount Paid on Reversed Judgment," and (2) an accounting of the rents received from the Park's tenants in 2004 and 2005.[8] On behalf of the Park's tenants, the City sought an order requiring MHC to pay restitution of all of the monies it collected from the tenants following the trial court's ruling that ordinances Nos. 381 and 412 were void, including (1) the difference between the permissive annual rate adjustment allowed by Ordinances 324/329 and the permissive annual increase allowed by ordinance No. 412; and (2) the base rent increase and one-time payment that MHC implemented in January 2004.

### 3. *MHC's Original Cross-complaint*

In April 2006 MHC filed a cross-complaint in the City of Santee Action, asserting five causes of action.

The first and second causes of action focused on (1) the City's enforcement of the provisions in ordinances Nos. 381 and 412 that (as established in the MHC Action) violated MHC's right to petition for a redress of grievances; and (2) the City's retroactive application of ordinance No. 412 to the date of the enactment of ordinance No. 381. The first cause of action alleged that enforcement of the mobilehome rent control ordinances under those circumstances constituted an unconstitutional regulatory taking in violation of the federal and state Constitutions under *Penn Central Transp. Co. v. New York City* (1978) 438 U.S. 104 [57 L.Ed.2d 631, 98 S.Ct. 2646] (*Penn Central*). The second cause of action alleged that enforcement of the mobilehome rent control ordinances under those circumstances violated the right to substantive due process under the state and federal Constitutions in that it imposed "substantial retroactive liability and costs" and it was "an 'irrational' land use regulation."

The third and fourth causes of action focused on the substantive provisions of Ordinances 324/329, ordinance No. 381 and ordinance No. 412 (collectively the Ordinances). The third cause of action alleged that the Ordinances effected an unconstitutional taking in violation of the state and federal Constitutions under four distinct theories: (1) a regulatory taking under *Penn Central, supra*, 438 U.S. 104; (2) a physical taking on the ground that "MHC is precluded from converting to another use by the City's political commitment to maintaining [the Park property] as a mobilehome park"; (3) a private taking as described in *Kelo v. New London* (2005) 545 U.S. 469 [162 L.Ed.2d

---

[8] According to the City, it first attempted to obtain restitution on behalf of the Park's tenants by filing a motion in the MHC Action, but the trial court in the MHC Action denied the motion because it was beyond the scope of the issues specified in our remand directive.

439, 125 S.Ct. 2655] (*Kelo*), because "[t]he clear purpose and effect of the Ordinances was to confer a favor on a discrete number of private individuals who then resided in the Park and who sought to acquire the Park"; and (4) a taking because it required an exaction as a condition to the owner's use of the property as described in *Nollan v. California Coastal Comm'n* (1987) 483 U.S. 825 [97 L.Ed.2d 677, 107 S.Ct. 3141] (*Nollan*) and *Dolan v. City of Tigard* (1994) 512 U.S. 374 [129 L.Ed.2d 304, 114 S.Ct. 2309] (*Dolan*). The fourth cause of action alleged that the Ordinances violate the right to substantive due process under the federal and state Constitutions.

The fifth cause of action sought equitable indemnification. MHC alleged that "[h]aving created a confusing regulatory scheme of enacting void and illegal ordinances, reviving old ordinances, and filing lawsuits in which they take inconsistent positions on which ordinance is in effect, the City should indemnify MHC for any costs, expenses, or liabilities it incurs defending itself against claims that it has not complied with the Ordinances."

### 4. *The Trial Court's Ruling on the Demurrer to the Original Cross-complaint*

The City filed a demurrer to MHC's cross-complaint. The trial court (1) sustained the demurrer to the first and third causes of action on ripeness grounds, with leave to amend; (2) sustained the demurrer without leave to amend as to the private taking and physical taking theories alleged in the third cause of action; and (3) with respect to the first and third causes of action, ruled that the statute of limitations barred recovery for any damages arising before April 7, 2004.

### 5. *MHC's Amended Cross-complaint*

MHC then filed an amended cross-complaint. The first cause of action alleged that the City's enforcement of the Ordinances, from April 7, 2004, to December 15, 2005,[9] effected a regulatory taking under *Penn Central, supra,* 438 U.S. 104. The second cause of action alleged a violation of the federal and state constitutional right to substantive due process based on "[t]he City's enforcement since approximately November 1998 of provisions that unconstitutionally chilled MHC's right to seek a discretionary rent increase and its retroactive application of Ordinance 412." The third cause of action focused on "the City's conduct on December 15, 2005, in severing the unconstitutionally chilling provisions of Ordinance 412 to make it a valid law, and then retroactively applying Ordinance 412 to the effective date of Ordinance 381,"

---

[9] According to the amended cross-complaint, December 15, 2005, is the date on which "the City severed the unconstitutionally chilling provisions from Ordinance 412 and retroactively applied Ordinance 412 to the effective date of Ordinance 381."

and alleged (1) a regulatory taking under *Penn Central, supra*, 438 U.S. 104, and (2) a taking under the theory described in *Nollan, supra*, 483 U.S. 825, and *Dolan, supra*, 512 U.S. 374. Finally, as in the original cross-complaint, the fourth cause of action alleged that the Ordinances violated the state and federal constitutional right to substantive due process, and the fifth cause of action sought equitable indemnification.

6. *The City's Motions for Summary Judgment and Summary Adjudication*

The City filed a motion for summary judgment challenging MHC's amended cross-complaint.

The trial court granted the motion. Specifically, it ruled (1) to the extent the first through fourth causes of action asserted as-applied claims, they were barred because they were not ripe, in that MHC failed to pursue a rent increase from the City prior to bringing the action; (2) to the extent the second through fourth causes of action alleged facial challenges to the Ordinances, those causes of action were barred by the statute of limitations; and (3) summary judgment was warranted on the fifth cause of action for equitable indemnity because MHC "failed to provide evidence raising a triable issue of material fact as to tort liability on the part of the City."

The City also filed a motion for summary adjudication on the causes of action in its amended complaint for (1) "Recovery of Amount Paid on Reversed Judgment," and (2) an accounting of rents collected from the Park's tenants in 2004 and 2005. The trial court granted the motion.

The parties then entered into a stipulation resolving the remaining causes of action in the City's amended complaint, and the trial court entered judgment.

D. *The Consolidated Appeals*

MHC filed notices of appeal in both the MHC Action and the City of Santee Action.

In its appeal of the MHC Action, MHC contends that the trial court erred in ruling that MHC is not entitled to damages on either of the bases specified in our remand directive.

In its appeal of the City of Santee Action, MHC contends that the trial court erred (1) in sustaining the demurrer with respect to the allegation that the City effected a private or physical taking; (2) in granting summary

judgment in favor of the City on MHC's cross-complaint; and (3) in granting summary adjudication in favor of the City on its causes of action for "Recovery of Amount Paid on Reversed Judgment" and an accounting.

We consolidated the appeals.

## II

## DISCUSSION

### A. *The MHC Action*

1. *MHC Has Not Established That the Trial Court Erred in Ruling That MHC Did Not Suffer Any Legally Remediable Injury Due to the Retroactive Application of Ordinance No. 412 to the Period Between the Enactment of Ordinance No. 381 and Ordinance No. 412*

The first issue specified in our remand directive in the MHC Action was whether MHC suffered any legally remediable injury due to the retroactive application of ordinance No. 412 to the date of the enactment of ordinance No. 381. (*MHC, supra*, 125 Cal.App.4th at p. 1396.) MHC focuses comparatively little attention on this issue in its appellate briefing, devoting only three pages to the issue in its opening appellate brief, and less than three pages to the issue in its reply brief, with the vast majority of MHC's appellate argument regarding the MHC Action focusing on the second issue in our remand directive, i.e., whether MHC suffered any legally remediable injury as a result of the violation of its right to petition under article I, section 3(a). As we will explain, MHC's challenge to the trial court's ruling on the first issue in our remand directive is without merit.

The trial court's ruling on the first issue in our remand directive focused on the seven differences between ordinance No. 412 and ordinance No. 381,[10]

---

[10] The seven differences between ordinance No. 412 and ordinance No. 381 are set forth in a table contained in the trial court's June 6, 2003 decision in the MHC Action. Four of the seven differences consist of minor wording changes regarding whether the provisions at issue concern *residents* in a mobilehome park or *homeowners* in a mobilehome park. A fifth difference changes the phrase "The commission *shall* make and adopt its own rules" to the phrase "The commission *may* make and adopt its own rules." (Both italics added.) A sixth

concluding that MHC had not established that it was injured by the retroactive application of ordinance No. 412 to the period between the enactment of ordinance No. 381 and ordinance No. 412. In its cursory treatment of the issue on appeal, MHC does not specifically challenge the trial court's finding that none of the seven differences gave rise to an injury to MHC when ordinance No. 412 was retroactively applied to the date of the enactment of ordinance No. 381. Instead, MHC argues that it "demonstrated that the retroactive application of those differences created an environment of confusion and uncertainty that diminished the value of MHC's property by approximately 5–10%." MHC argues that the trial court's decision was flawed because the trial court improperly sustained objections to testimony presented by two of MHC's witnesses, which would have established that diminution in value. MHC contends that if the trial court had considered the testimony of those witnesses, the evidence would have supported a finding that MHC was injured by the retroactive application of ordinance No. 412 to the date between the enactment of ordinance No. 381 and ordinance No. 412.

MHC first focuses on the testimony of its executive vice-president and general counsel, Ellen Kelleher. Over the City's objection that Kelleher had not been designated as an expert witness, the trial court permitted Kelleher to testify about her opinion on whether the retroactive application of ordinance No. 412 had a negative impact on the value of the Park, reserving a ruling on the objection until after it considered the relevant authorities. After considering those authorities, the trial court, in its statement of decision, sustained the City's objections to Kelleher's testimony on the subject of valuation, but it also stated that "even if the objections were overruled," it was "not persuaded by Ms. Kelleher's testimony about the diminishment of value of the property." The trial court explained that it viewed Kelleher's testimony as speculative.[11]

---

difference changes the designation of the party to whom a mobilehome park owner must send a rent adjustment application—from the address of "each *eligible* manufactured home in the park" to "each manufactured home in the park." (Italics added.) A seventh difference adds a paragraph stating, "Where uncollected space rents must be estimated, the average of the preceding three years experience shall be used."

[11] We agree with the trial court that Kelleher's testimony was speculative. Kelleher testified that "the retroactive application of the ordinance *could* have a very significant, um, impact on the value of the property" and that "you *could argue* that, um, that much of the value of the property is taken by" negative marketplace reaction to the retroactive application of the ordinance, and that "the operational impact[] of the changes . . . *could* be as much as 5 to 10 percent." (Italics added.) MHC cites case law holding that "[w]here the *fact* of damages is certain, the amount of damages need not be calculated with absolute certainty," and that "damages may be computed even if the result reached is an approximation." (*GHK Associates v. Mayer Group, Inc.* (1990) 224 Cal.App.3d 856, 873 [274 Cal.Rptr. 168].) That case law is inapplicable here because Kelleher was not able to testify that the *fact* of MHC's damages was certain. Instead, she testified that the situation presented by the enactment of ordinance

Based on this background, we reject MHC's argument that the trial court would have come to a different conclusion as to whether MHC was damaged by the retroactive application of ordinance No. 412 had it not sustained the objection to Kelleher's testimony. The trial court clearly considered Kelleher's testimony and found that it lacked probative value.

Next, MHC focuses on the testimony of its expert John Quigley. As with Kelleher's testimony, the trial court admitted Quigley's testimony as to the value of the Park, subject to later considering an objection on the ground that Quigley was not designated to testify on that subject. In a footnote to its statement of decision, the trial court sustained the objection to Quigley's testimony, but in the body of its statement of decision the trial court considered the substance of Quigley's testimony. There, the trial court explained that Quigley's testimony lacked any probative value on the subject of whether the retroactive application of ordinance No. 412 caused injury to MHC because Quigley "conceded that he was not aware of the differences between Ordinance 381 and Ordinance 412" and "his sole testimony . . . related to the value of the Park absent regulation."

Because the trial court considered Quigley's testimony and concluded that it lacked probative value, MHC cannot establish that the trial court prejudicially erred by sustaining the City's objection to Quigley's testimony.

In sum, we conclude that MHC has presented no basis for us to reverse the trial court's decision in the MHC Action that MHC sustained no legally remediable injury from the retroactive application of ordinance No. 412 to the period between the enactment of ordinance No. 381 and ordinance No. 412.

> 2. *The Trial Court Correctly Ruled That MHC May Not Recover Damages for the City's Violation of Its Right to Petition Under the California Constitution*

We next consider the issue to which MHC devotes most of its attention in its appeal of the judgment in the MHC Action, namely, "whether MHC suffered any legally remediable injury as a result of enforcement of any of the provisions in ordinances Nos. 381 and 412 that the court found to be unconstitutional." (*MHC, supra*, 125 Cal.App.4th at p. 1399.) Following our second remand directive, the trial court considered the issue and ruled that MHC suffered no legally remediable injury as a result of the City's enforcement of the Unconstitutional Provisions of ordinances Nos. 381 and 412 in violation of MHC's right to petition under article I, section 3(a).

---

No. 412 *could* have had an impact on the value of the Park. The trial court reasonably concluded that such testimony was speculative and accordingly lacked probative value.

As we have explained, the trial court set forth two independent bases for its ruling: (1) that, as a matter of law, the remedy of damages was not available for a violation of the right to petition guaranteed by article I, section 3(a);[12] and (2) even if a damages remedy was available, MHC had not established that it incurred any damages because it would not have obtained a rent adjustment had it filed an application with the Commission.

In its opening appellate brief, MHC devotes only two and a half pages to the first of the trial court's two independent grounds for its ruling, making a cursory argument that the trial court erred in finding that damages are not recoverable for a violation of article I, section 3(a). In contrast, MHC expends over 40 pages challenging the second independent basis for the trial court's ruling, i.e., that MHC did not incur any damages as a result of the violation of its right to petition. MHC asserts several grounds for its contention that the trial court erred in ruling that no damages resulted from the violation of MHC's right to petition.[13] Each one of these arguments relates to MHC's contention that it did *in fact* incur damages as a result of the violation of its right to petition. However, we need not, and do not, reach any of these arguments. Instead, as we will explain, we find the first of the trial

[12] In its reply brief, MHC contends that "[the trial court's] ruling that MHC could not recover monetary relief applied *only* to the City's violation of MHC's right to petition under [article I, section 3(a)]. *As to that specific injury*, [the trial court] ruled that MHC could not recover monetary damages. . . . [¶] But MHC also suffered other injuries from the City's enforcement of the Unconstitutional Provisions, including lost rental income that it would have received had the City not chilled it from applying for a rent increase." MHC contends that on this basis it may still recover for the injuries caused by the Unconstitutional Provisions, even if we affirm the trial court's ruling that MHC is precluded as a matter of law from recovering damages for a violation of the right to petition in article I, section 3(a). We disagree. As the trial court correctly understood, the only issue within the scope of our second remand directive was whether the violation of MHC's right to petition caused legally remediable injury to MHC. Thus, if MHC is precluded as a matter of law from recovery for injuries caused by the violation of its right to petition, there is no other injury for which MHC may receive damages under our second remand directive.

[13] First, in contending that the trial court erred in finding that it incurred no damages as a result of the violation of its right to petition, MHC sets forth numerous arguments contesting the standards that the trial court used to determine whether the Commission would have allowed a rent adjustment if MHC had applied for one. Second, MHC also contends that the trial court applied the wrong time period in its analysis, arguing that the City allegedly enforced the Unconstitutional Provisions until December 2005, and that the trial court had discretion to consider injuries suffered prior to November 2000. Third, MHC claims that in assessing whether MHC incurred any damages, the trial court did not consider *all* of the provisions that were found to violate the right to petition. Fourth, MHC argues that in addition to lost rents incurred when it did not apply for a rent adjustment, the trial court should have found that the Unconstitutional Provisions caused MHC (1) to lose long-term tenant leases; (2) to incur legal expenses; (3) to incur the dismissal, on ripeness grounds, of its federal lawsuit challenging ordinances Nos. 381 and 412; and (4) to incur the payment of $35,856 in legal defense assessments that the trial court ruled violated the right to petition in article I, section 3(a).

court's independent grounds for its decision to be dispositive. A plaintiff may not, as a matter of law, recover damages for a violation of article I, section 3(a).

We begin our analysis by focusing on the text of article 1, section 3(a). That provision of our state Constitution establishes that "[t]he People have the right to instruct their representatives, petition government for redress of grievances, and assemble freely to consult for the common good." (Art. I, § 3(a).) The question presented is whether a plaintiff may obtain an award of damages if it establishes a violation of that state constitutional provision.

■ Our Supreme Court in *Degrassi, supra,* 29 Cal.4th 333, and *Katzberg, supra,* 29 Cal.4th 300, described the analytical steps that a court must apply when it considers whether the violation of a specific provision of our state's Constitution gives rise to the right to recover damages. Premising its approach on the United States Supreme Court's discussion in *Bivens v. Six Unknown Fed. Narcotics Agents* (1971) 403 U.S. 388 [29 L.Ed.2d 619, 91 S.Ct. 1999] (*Bivens*), our Supreme Court set forth the following analysis.

"First, we shall inquire whether there is evidence from which we may find or infer, within the constitutional provision at issue, an affirmative intent either to authorize or to withhold a damages action to remedy a violation. In undertaking this inquiry we shall consider the language and history of the constitutional provision at issue, including whether it contains guidelines, mechanisms, or procedures implying a monetary remedy, as well as any pertinent common law history. If we find any such intent, we shall give it effect." (*Katzberg, supra,* 29 Cal.4th at p. 317.)

■ "Second, if no affirmative intent either to authorize or to withhold a damages remedy is found, we shall undertake the 'constitutional tort' analysis adopted by *Bivens* and its progeny. Among the relevant factors in this analysis are whether an adequate remedy exists, the extent to which a constitutional tort action would change established tort law, and the nature and significance of the constitutional provision. If we find that these factors militate against recognizing the constitutional tort, our inquiry ends. If, however, we find that these factors favor recognizing a constitutional tort, we also shall consider the existence of any special factors counseling hesitation in recognizing a damages action, including deference to legislative judgment, avoidance of adverse policy consequences, considerations of government fiscal policy, practical issues of proof, and the competence of courts to assess particular types of damages." (*Katzberg, supra,* 29 Cal.4th at p. 317; see also *Degrassi, supra,* 29 Cal.4th at pp. 338, 342–344.)

Turning to the first step of the prescribed analysis, we examine whether the language and history of article I, section 3(a) allows us to infer an affirmative intent either to authorize or to withhold a damages action to remedy a violation.

We find no assistance in the language of article I, section 3(a) itself. Indeed, this is to be expected, as "the language of most constitutional provisions does not speak to or manifest any intent to include a damages remedy for a violation of the provision." (*Degrassi, supra*, 29 Cal.4th at p. 338.)

As for the history of article I, section 3(a), we also find no indication of an intent to either allow or disallow an action for damages. As was the case with the provision guaranteeing the right to free speech appearing in article I, section 2, subdivision (a) of the California Constitution that our Supreme Court considered in *Degrassi, supra*, 29 Cal.4th at pages 339–340, the text of article I, section 3(a) was added to the California Constitution through Proposition 7 on the November 1974 ballot. (Ballot Pamp., Gen. Elec. (Nov. 5, 1974) text of Prop. 7, p. 27 (Proposition 7).) We have reviewed the ballot materials that were before the voters in connection with Proposition 7, and we find no suggestion of any intent to create or foreclose a damages remedy for a violation of article I, section 3(a). As did our Supreme Court in *Degrassi*, we have also considered materials from the drafters of the constitutional revision that was adopted by the electorate in Proposition 7, and we find no evidence that the drafters considered the issue of whether a damages remedy would be available for a violation of the constitutional right to petition. (Cal. Const. Revision Com., Proposed Revision (pt. 5, 1971) p. 23 [comment on proposed revision limited to recommendation that it be retained and broadened to permit the petition of " 'government' " in general rather than merely the " 'Legislature' "]; Cal. Const. Revision Com., Art. I (Declaration of Rights) Background Study 3 (Oct. 1969) pp. 25–32 [concerning proposed revision of Cal. Const., former art. I, § 10]; Cal. Const. Revision Com., Art. I (Declaration of Rights) Rep. III (Jan. 1970) p. 6 [concerning proposed revision of Cal. Const., former art. I, § 10].)

Ever since its adoption in 1849 and its reenactment in 1879, the California Constitution, prior to Proposition 7, provided for the right to petition through its former article I, section 10.[14] As did our Supreme Court in *Degrassi, supra*, 29 Cal.4th at pages 339–340, we have reviewed the relevant passages of the

---

[14] The former provision stated that "[t]he people shall have the right . . . to petition the legislature for redress of grievances." (Cal. Const. of 1849, art. I, § 10; see also Cal. Const. of 1879, art. I, § 10.)

debates that preceded the adoption of the 1849 and 1879 Constitutions and find no evidence that the drafters considered whether a violation of the right to petition could give rise to a suit for damages. (See Browne, Rep. of Debates in Convention of Cal. on Formation of State Const. (1850) pp. 31, 42, 294; 1 Willis & Stockton, Debates and Proceedings, Cal. Const. Convention 1878–1879, pp. 155, 264; 3 Willis & Stockton, Debates and Proceedings, Cal. Const. Convention 1878–1879, pp. 1179, 1425.)

We requested that the parties provide supplemental briefing identifying any available history of article I, section 3 of the California Constitution from which we might infer an intent to permit or foreclose an action for damages. The parties agree that no such materials exist. Further, the parties' briefing has not identified any authority recognizing a common-law-based right to seek damages from an asserted violation of the right to petition, and we are aware of none. (See *Degrassi, supra,* 29 Cal.4th at p. 341 [discussing the lack of any common-law-based right to seek damages for an asserted violation of free speech rights]; *Katzberg, supra,* 29 Cal.4th at p. 322 [considering common law history].)

Instead of identifying a common law right to recover damages for a violation of the right to petition, MHC points to the Legislature's enactment of the anti-SLAPP[15] statute (Code Civ. Proc., § 425.16). That provision allows a defendant to bring a special motion to strike any cause of action "arising from any act of that person in furtherance of the person's right of petition" (*id.,* subd. (b)), and, as MHC emphasizes, with certain exceptions allows a successful party to recover attorney fees (*id.,* subd. (c)). We find the anti-SLAPP statute to be inapposite. Under *Degrassi* and *Katzberg,* our inquiry is whether any authority exists recognizing a common law right to obtain damages for violation of the right to petition. The Legislature's enactment of the anti-SLAPP statute does not imply the existence of any such common law right.

In sum, we find nothing in the text or history of article I, section 3(a) to indicate an intention to either allow or disallow a damages remedy. Accordingly, we proceed to the second step of the analysis set forth in *Katzberg* and *Degrassi* and determine "whether a constitutional tort action for damages to remedy the asserted constitutional violation should be recognized." (*Katzberg, supra,* 29 Cal.4th at p. 324; see also *Degrassi, supra,* 29 Cal.4th at p. 342 [quoting *Katzberg*].)

---

[15] SLAPP is an acronym for strategic lawsuit against public participation. (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1109 & fn. 1 [81 Cal.Rptr.2d 471, 969 P.2d 564].)

In deciding whether to recognize a damages remedy, the first factor we may consider is whether the plaintiff has meaningful alternative remedies. (*Katzberg, supra,* 29 Cal.4th at pp. 325–327; *Degrassi, supra,* 29 Cal.4th at p. 342.) Here, as the history of the MHC Action demonstrates, MHC had available to it the remedy of declaratory and injunctive relief, and in fact did exercise its right to obtain those remedies, which resulted in a ruling severing the Unconstitutional Provisions from ordinance No. 412. (See *Katzberg,* at p. 326 [noting that the plaintiff could have sought declaratory or injunctive relief]; *Degrassi,* at p. 343 [noting that plaintiff could have sought an injunction against the challenged conduct with the effect of avoiding much of the conduct complained of, and rejecting the suggestion that such a remedy would be "innocuous or empty"].)

The second factor we may consider is "the extent to which a constitutional tort action would change established tort law." (*Katzberg, supra,* 29 Cal.4th at p. 327.) The parties have not identified any existing tort law that would permit an action for damages arising from the violation of the right to petition, and we are aware of none. Accordingly, we would be changing established tort law if we were to recognize a damages remedy for violation of the constitutional right to petition in article I, section 3(a).

The third factor discussed in *Katzberg* and *Degrassi* is "the nature of the provision and the significance of the purpose that it seeks to effectuate." (*Katzberg, supra,* 29 Cal.4th at p. 328; see also *Degrassi, supra,* 29 Cal.4th at p. 343.) However, as pointed out in *Katzberg,* " '[w]hile this factor may be a proper consideration in the overall analysis, it is not one upon which we place great significance. How does one rank the importance of different constitutional provisions?' " (*Katzberg,* at p. 328, quoting *Carlsbad Aquafarm, Inc. v. State Dept. of Health Services* (2000) 83 Cal.App.4th 809, 823 [100 Cal.Rptr.2d 87] (*Carlsbad Aquafarm*).) "[W]hen the considerations mentioned above do not militate in favor of recognizing a constitutional tort action, *the relative importance* of the right, standing alone, is not a factor of great significance." (*Degrassi,* at p. 343, italics added.) Thus, while the right to petition is a venerable and fundamental constitutional right that is also present in the United States Constitution's Bill of Rights,[16] because it is

---

[16] "The right of petition, like the other rights contained in the First Amendment and in the California constitutional Declaration of Rights, is accorded 'a paramount and preferred place in our democratic system,' " and " 'the rights to assemble peaceably and to petition for a redress of grievances are among the most precious of the liberties safeguarded by the Bill of Rights.' " (*City of Long Beach v. Bozek* (1982) 31 Cal.3d 527, 532 [183 Cal.Rptr. 86, 645 P.2d 137].) " 'The right to petition for redress of grievances is a basic right guaranteed by the state and federal Constitutions' " and "[a] person's right of access to judicial and quasi-judicial bodies to decide controversies is a fundamental component of our society . . . ." (*De Anza Santa Cruz Mobile Estates Homeowners Assn. v. De Anza Santa Cruz Mobile Estates* (2001) 94 Cal.App.4th 890, 919 [114 Cal.Rptr.2d 708].)

difficult to assess the relative significance of constitutional provisions, our analysis is not significantly impacted by the nature of that right.

■ In this case, as in *Degrassi*, "even if we were, at this point in our analysis, inclined toward recognizing a constitutional tort action for damages in the case before us, a final factor would counsel strongly against . . . recognition of such an action." (*Degrassi, supra*, 29 Cal.4th at p. 343.) Specifically, as *Degrassi* explained, "courts have expressed reluctance to create a damages action when doing so might, among other things, produce adverse policy consequences or practical problems of proof, or when there is reason to question the competence of courts to assess particular types of damages." (*Ibid.*)

As aptly demonstrated by the trial court's attempt in the MHC Action to assess damages for the violation of MHC's right to petition, a court charged with determining the damages arising out of the violation of a party's right to petition a governmental body will run into practical problems of proof and will be forced to make decisions for which it lacks competence. Specifically, as was the case in the MHC Action, to determine the damages resulting from the violation of a right to petition, a court will be required to determine whether the party who was denied the right to petition *would have been successful* had it exercised the right. In the MHC Action, for instance, the trial court was required to put itself in the hypothetical position of the Commission to determine whether the Commission would have permitted MHC to make a rent adjustment had it filed an application. It is the role of the Commission, not the courts, to make such a determination in the first instance. (See *Kavanau v. Santa Monica Rent Control Bd.* (1997) 16 Cal.4th 761, 784 [66 Cal.Rptr.2d 672, 941 P.2d 851] ["Setting rent ceilings is essentially a legislative task, and agencies, not courts, choose which administrative formula to apply."].) As one court has observed in deciding against creating a damages remedy for violation of the state constitutional right of procedural due process, "[t]here are substantial inherent difficulties in proving a party's damages [that] resulted from the denial of a hearing . . ." as the government agency at issue often has substantial discretion in ruling on the merits of an issue. (*Carlsbad Aquafarm, supra*, 83 Cal.App.4th at p. 822.) We are reluctant to create a constitutional tort action for damages that would put our trial courts in the position of trying to divine what decision a governmental body would have made if it had received a petition or application for relief.

■ Accordingly, we conclude that money damages is not an appropriate remedy for a violation of the right to petition set forth in article I, section 3(a).

B. *The City of Santee Action**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

We affirm the judgment in the MHC Action, and the City is awarded costs in that action.

In the City of Santee Action, we reverse the summary adjudication in favor of the City on the fourth and fifth causes of action in its amended complaint. In all other respects the judgment is affirmed. In the City of Santee Action, each party is to bear its own costs.

Benke, Acting P. J., and McIntyre, J., concurred.

A petition for a rehearing was denied April 9, 2010, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied June 17, 2010, S182192.

---

*See footnote, *ante*, page 1169.