Filed 5/23/17 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN


| | |
|---|---|
| KATIA JULIAN, | B263563 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. LC100529) |
| v. | |
| MISSION COMMUNITY HOSPITAL et al., | ORDER MODIFYING OPINION; PETITION FOR REHEARING DENIED; NO CHANGE IN JUDGMENT |
| Defendants and Respondents. | |


The opinion filed May 2, 2017, and certified for publication, is modified as follows:

1.  On page 5, the second sentence of the second paragraph reads as follows:

While Castro was discussing the situation with Officer Valencia, the crisis counselor, Karen Miller, called Castro with additional questions about Julian.

The sentence is revised to read:

While Castro was discussing the situation with Officer Valencia, Karen Miller and a crisis counselor called Castro with additional questions about Julian.

This order does not change the judgment. Appellant's petition for rehearing is denied.

_____

PERLUSS, P. J.          SEGAL, J.          SMALL, J. (Assigned)

2

Filed 5/2/17 (unmodified version)

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN


| | |
|---|---|
| KATIA JULIAN, | B263563 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. LC100529) |
| v. | |
| MISSION COMMUNITY HOSPITAL et al., | |
| Defendants and Respondents. | |


APPEAL from a judgment of the Superior Court of Los Angeles County, Frank J. Johnson, Judge.  Affirmed.

Law Office of Gary Brown and Gary Brown for Plaintiff and Appellant.

Cole Pedroza, Kenneth R. Pedroza, E. Todd Chayet; Reback, McAndrews, Kjar, Warford & Stockalper, Thomas F. McAndrews and Tracy D. Hughes for Defendants and Respondents Mission Community Hospital and Deanco Healthcare, LLC.

Bonne, Bridges, Mueller, O'Keefe & Nichols, David J. O'Keefe, Thomas M. O'Neil, Michael Vincent Ruocco and Gary Dennis for Defendant and Respondent Abdul Shirazi, M.D.

Lynberg & Watkins, Gary A. Bacio and Christopher P. Bates for Defendants and Respondents Los Angeles Unified School District, Los Angeles Unified School Police, Libier Valencia, Yvonne Miranda, Elizabeth Lara, Jose Cardenas, and Robert Taylor.

---

**INTRODUCTION**

This action arises out of a series of events that began at a Los Angeles middle school, where Katia Julian taught mathematics, and ended at Mission Community Hospital, where Julian was involuntarily detained for mental health evaluation and treatment. After her release, Julian sued the Los Angeles Unified School District (LAUSD), the Los Angeles Unified School Police (LAUSP), and five individual police officers (collectively, the school defendants) who detained her and helped transport her to the hospital. She alleged the school defendants did not have probable cause under Welfare and Institutions Code section 5150 to detain her.[1] Julian also sued the hospital (Mission Community Hospital), its owner (Deanco Healthcare, LLC), and the physician who treated her there (Dr. Abdul Shirazi)

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

2

(collectively, the hospital defendants), alleging they lacked probable cause to continue to detain her and to admit her to the hospital where she spent one night before she was released the next day.

Julian's operative third amended complaint sought monetary damages for various alleged violations of the Lanterman-Petris-Short Act (section 5000 et seq.) (the Act) and of her civil rights under the federal and state constitutions. The trial court sustained the hospital defendants' demurrers to Julian's third amended complaint and granted the school defendants' motion for summary judgment.

We conclude there is no private right of action for the violations of the Act Julian alleged. We also conclude the school district and the school police are immune from liability under Title 42 United States Code section 1983 (section 1983), the individual officers are entitled to qualified immunity, the hospital and physician are not state actors for purposes of Julian's section 1983 claims, most of the provisions of the California Constitution Julian invoked do not create causes of action for damages, and Julian failed to state a claim for violations of those provisions that might provide such a cause of action. Finally, because the hospital defendants are not state actors for purposes of section 1983, they cannot be liable for Julian's alleged violations of the California Constitution. Therefore, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.     *The School Police Detain Julian*

On May 1, 2012 Julian attended a mathematics department meeting in a classroom at the middle school where

3

she taught.[2]  Julian claimed that at the end of the meeting another teacher "physically assaulted" her by grabbing her hand as she tried to close the door to the classroom.  Julian reported the alleged assault to the school's principal, Nidia Castro, who told Julian she would report the incident to the school police.  Julian asked Castro not to report the incident to the school police because, as Castro knew, Julian had "a severe nervous reaction" to the school police stemming from earlier incidents.  Castro also knew Julian had a "seizure disorder that was exacerbated by extreme stress."

That evening Castro received a text message from Julian's close friend, Jackie Ibrahim, another teacher at the school who had been discussing with Julian some recent changes at the school.  The message read, "Wow I finally convinced Katia to stay and now you throw me this curve ball--it seems the situation changes each day . . . you really got our hopes up and now you are going back on what you said.  I want to throw up and Katia wants to slit her wrists."  Castro responded, "I am concerned about the line 'Katia wants to slit her wri[s]ts' do I need to send someone to her?  Are you with her?  Will she be okay?  This entire process has been very chaotic and has not been easy for me either.  Just hang in there."  Ibrahim informed Castro she was with Julian, and Castro took no further action at that time.

---

[2]     The facts relevant to the school defendants are from the operative third amended complaint, facts identified as undisputed in Julian's separate statement in opposition to the school defendants' motion for summary judgment, and Julian's declaration.  The facts relevant to the hospital defendants are from the allegations of the third amended complaint only.

4

The following morning Castro met with Julian on an unrelated matter and recorded in her notes that they had "a very relaxed, friendly conversation." Despite Julian's request that Castro not report the alleged assault to the school police, Castro believed "a report needed to be made," so she sought advice from a superior who suggested she speak with someone in the office of crisis counseling. Castro explained to the crisis counselor that she knew she had a responsibility to address Julian's claim of a physical assault but wanted to be sensitive to her fear of the school police. Castro also explained she needed to be "extra sensitive" in light of Ibrahim's text stating that Julian wanted to slit her wrists. The crisis counselor reminded Castro of her "responsibility for employee safety" and advised her to follow the guidelines governing workplace violence.

Castro reported the alleged assault to Officer Libier Valencia, a school police officer assigned to the middle school, even though Castro knew Julian disliked Officer Valencia. While Castro was discussing the situation with Officer Valencia, the crisis counselor, Karen Miller, called Castro with additional questions about Julian. During this conversation, Castro and Officer Valencia revealed that Julian had scratches on her forearms Julian had told Castro were caused by her cats and that Julian had expressed a need for "revenge" against yet another teacher who had crossed her. All of the participants in this conversation agreed they needed additional information from Julian about the alleged assault, and, because Castro and Officer Valencia knew Julian would not want to speak to Officer Valencia, they requested another officer question Julian. Sergeant Robert Taylor, Officer Valencia's superior officer, eventually arrived to question her.

Before questioning Julian, Sergeant Taylor called Miller for more information. Miller told Sergeant Taylor she was concerned about Julian's mental stability because Julian had recently lost a different lawsuit against the school district and had told her best friend she was going to "slit her wrists." Miller impressed upon Sergeant Taylor that Julian might be suicidal. Sergeant Taylor requested additional officers for backup, including Officers Yvonne Miranda, Elizabeth Lara, and Jose Cardenas.

Aware of Julian's previous encounters with Officer Valencia, Sergeant Taylor and Castro agreed that Castro would make initial contact with Julian and explain to her Sergeant Taylor was there to interview her about the alleged assault. The other officers remained in a conference room nearby while Castro approached Julian with Sergeant Taylor behind her. Castro told Julian the officer was there to "take her report." In response, Julian ran down the hallway and placed herself between a student desk and a copier. She told Sergeant Taylor she did not want to talk to him, began crying and screaming, and dropped or slid to the floor with her back against the wall. Another school administrator came out of her office, told Castro she had seen Julian do something similar before, and offered to take Julian into her office so she could calm down. Castro declined her offer because Julian continued screaming "get away from me" and Castro did not know at whom Julian was screaming.

According to Castro's notes, which Julian submitted in opposition to the school defendants' motion for summary judgment (and which the parties refer to as the "Castro timeline"), Sergeant Taylor asked Julian to "calm down" and told her "she [w]as safe." Julian began "screaming even louder." As Officer Valencia approached, Julian continued screaming, "Get

6

away from me." Castro crouched down in front of Julian and told her she would not leave her alone with the officers and they would not harm her, while Sergeant Taylor remained four or five feet away. Julian told Castro she was afraid Sergeant Taylor was going to hurt her, and Castro told her that "all he wanted was to get her statement regarding her allegations of physical assault." Julian said Sergeant Taylor "was [taking] her freedom away." Castro asked Sergeant Taylor to leave her alone with Julian, but he said he could not do that. Sergeant Taylor stated that, "due to [Julian's] state and reactions, he was going to call paramedics," at which point Julian yelled she had done nothing wrong and continued to scream "leave" and "get away from me."

While waiting for the ambulance to arrive, Julian reached for her phone inside a small bag beside her. Not knowing what Julian was reaching for, Sergeant Taylor approached, knelt down, and turned Julian around to handcuff her. Julian resisted, and Sergeant Taylor called the other officers to assist. Officer Miranda attempted to control the growing crowd of students, employees, and parents in the area. Julian continued to scream, struggled with the officers, and complained after she had been handcuffed that her back hurt. Julian asked Castro to take her phone from her bag and call her attorney, but Castro was unable to call him before the ambulance arrived.

When the paramedics arrived, they attempted to move Julian to a gurney, but she resisted and said to Castro, "Do you see what they are doing to me?" Another administrator told Julian to cooperate, but Castro noted the more the paramedics asked Julian to calm down "the angrier she became." Eventually the paramedics secured Julian on a gurney and transported her

7

to Mission Community Hospital, approximately one block from the school.

B.    *The Hospital Detains Julian*

Upon arriving at the hospital, Julian continued "to thrash and try to slide off the [g]urney." Officer Valencia gave the hospital a completed Application for 72-Hour Detention for Evaluation and Treatment form pursuant to section 5150. The application stated Julian "went out of control, throwing herself to the floor" when the school police contacted her about a criminal investigation, and Julian "made statements to [an]other school staff member that she wanted to cut her wrist." The section 5150 application further stated: "She has 6 to 8 cuts on the right & left wrist. Mrs. Julian came into a crawling position and was screaming out of control." The document concluded, "Based upon the above information it appears that there is probable cause to believe that [Julian] is, as a result of mental disorder[, a] danger to . . . herself [and a] danger to others." Julian calmed down after approximately 15 minutes in the hospital, and the paramedics asked the officers to remove the handcuffs.

Dr. Daniel Moghadam initially examined Julian. Julian alleged he ignored the "cat scratches" on her arms, failed to investigate her seizure disorder, and "erroneously accepted" the information in the section 5150 form from the school police. Dr. Moghadam transferred Julian to the Behavioral Health Unit. Julian alleged the hospital held her there an "unnecessarily long time," and she never received a proper examination by a qualified individual designated by the hospital pursuant to the Welfare and Institutions Code. Instead, she alleged, Dr. Shirazi, who was not a board certified psychiatrist or designated by the hospital to

8

detain persons with possible mental disorders, telephonically ordered Julian's detention for up to 72 hours and "illegally prescribed anti-psychotic medications" without examining her or obtaining her informed consent.

Although the chronology of events in Julian's allegations is unclear, she appears to have alleged that, after her detention, another doctor, "who was not qualified to do an assessment and yet improperly diagnosed an *acute psychosis*, noted but did not investigate a seizure disorder, and also failed to notice the lack of cuts on her arms." After Julian spent the night in the hospital, Dr. Shirazi personally examined her the next day and released her. Julian alleged, "Had the hospital protocol required the physician to undertake a careful examination of [her] . . . [she] would have been rejected as a detainee."

## C. *Julian Sues the School Defendants and the Hospital Defendants*

Julian sued the school defendants and the hospital defendants for violations of the Act, violations of her civil rights under section 1983 and the California Constitution, false imprisonment, intentional infliction of emotional distress, and medical negligence. The trial court sustained demurrers by all of the defendants, and Julian eventually filed the operative third amended complaint. That complaint did not include causes of action for intentional infliction of emotional distress or medical negligence.[3]

The school defendants answered the third amended complaint and filed a motion for summary judgment or in the

---

[3] The third amended complaint also dropped claims against Dr. Moghadam and another doctor who examined Julian.

alternative summary adjudication.  The hospital defendants demurred again.

Following a hearing on the demurrers and the motion for summary judgment, the trial court granted the school defendants' motion for summary judgment.  With regard to Julian's first cause of action for violations of the Act, the court ruled the school defendants were immune from liability because they properly exercised their authority to place Julian on a 72-hour hold.  In particular, the court stated Julian's "behavior was bizarre and the [school defendants] are not required to make a definitive prognosis of [Julian's] mental health" before detaining her.  With regard to Julian's civil rights claims, the court found the school defendants enjoyed qualified immunity and "undisputed supporting evidence supported the actions of the [school defendants'] authority under the law" to detain Julian.  The court also found the school defendants were immune from liability for civil rights violations under the California Constitution pursuant to Government Code section 821.6.  Counsel for Julian abandoned the false imprisonment cause of action by acknowledging it was "no longer viable."

On the demurrers by the hospital defendants, the court ruled the third amended complaint failed to state facts sufficient to constitute causes of action.  The court found the third amended complaint was not significantly different from the "prior iterations of the complaint."  With regard to the cause of action for statutory violations, the court stated "the pleading suffers from the same shortcomings as that in the [second] amended

10

complaint without new facts or law presented."[4]  On Julian's causes of action for civil rights violations, the court ruled the complaint failed "to show how Dr. Shirazi, or the hospital, acted under the color of law or had any role in violating [Julian's] civil rights."  Julian again conceded her cause of action for false imprisonment was not viable and withdrew it.  The court sustained the demurrers without leave to amend.[5]  Julian timely appealed from the ensuing judgment.

## DISCUSSION

A.    *Standard of Review*

"A motion for summary judgment is properly granted only when 'all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'  [Citation.]  We review a grant of summary judgment de novo and decide independently whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law.  [Citations.]  The evidence must be viewed in the light most favorable to the nonmoving party."  (*Samara v. Matar* (2017) 8 Cal.App.5th 796, 802-803; see Code Civ. Proc., § 437c, subd. (c); *Biancalana v. T.D. Service Co.* (2013) 56 Cal.4th 807, 813; *Drexler v. Petersen* (2016) 4 Cal.App.5th 1181, 1188.)  "A triable issue of material fact exists where 'the

---

[4]    The trial court's ruling on the hospital defendants' demurrers to the second amended complaint is not in the record.

[5]    Julian does not contend on appeal the trial court should have granted her leave to amend the third amended complaint, nor on appeal does she ask for leave to amend.

11

evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof.'" (*Jade Fashion & Co., Inc. v. Harkham Industries, Inc.* (2014) 229 Cal.App.4th 635, 643.)  We may affirm a summary judgment if it is correct on any of the grounds asserted in the trial court, regardless of the trial court's stated reasons.  (*Grebing v. 24 Hour Fitness USA, Inc.* (2015) 234 Cal.App.4th 631, 637.)

We review the trial court's order sustaining the hospital defendants' demurrers de novo.  (See *Eckler v. Neutrogena Corp.* (2015) 238 Cal.App.4th 433, 438; *Lewis v. Safeway, Inc.* (2015) 235 Cal.App.4th 385, 390-391.)  In so doing, we exercise our "'independent judgment about whether the complaint states a cause of action as a matter of law.'" (*Eckler*, at p. 438.)  We assume the truth of all properly pleaded facts, but we do not assume the truth of contentions, deductions, or conclusions of fact or law.  (*Lyles v. Sangadeo-Patel* (2014) 225 Cal.App.4th 759, 764; see *Eckler*, at p. 438.)  We review questions of statutory interpretation de novo.  (*John v. Superior Court* (2016) 63 Cal.4th 91, 95; *Even Zohar Const. & Remodeling, Inc. v. Bellaire Townhouses, LLC* (2015) 61 Cal.4th 830, 837.)

"'If a demurrer is sustained, we exercise our independent judgment on whether a cause of action has been stated as a matter of law, regardless of reasons stated by the trial court.  [Citation.]  We affirm if the trial court's decision was correct on any theory.'" (*Schermer v. Tatum* (2016) 245 Cal.App.4th 912, 923; see *Ivanoff v. Bank of America, N.A.* (2017) 9 Cal.App.5th 719, 732, fn. 2 ["appellate court must affirm if the trial court's decision to sustain the demurrer was correct on any theory"].)

B.    *The Lanterman-Petris-Short Act*

The Legislature enacted the Act in 1967 to govern the involuntary commitment of mentally disordered persons.  (Stats. 1967, ch. 1667, § 36, p. 4074; *State Dept. of Public Health v. Superior Court* (2015) 60 Cal.4th 940, 952; *Coburn v. Sievert* (2005) 133 Cal.App.4th 1483, 1492.)  One of the purposes of the Act is to provide "prompt evaluation and treatment of persons with mental health disorders or impaired by chronic alcoholism." (§ 5001, subd. (b).)  This purpose "reflects the unfortunate reality that mental illness in its most acute form can pose a danger to the individuals themselves or others that requires immediate attention.  To achieve this purpose, a number of [the] Act['s] provisions allow a person to be removed from the general population in order to be civilly committed based on a probable cause determination made by a mental health or law enforcement professional, and then to challenge the civil commitment within a reasonable time afterwards."  (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253-254.)

The Act safeguards the rights of the involuntarily committed through judicial review.  (See § 5001; *Sorenson v. Superior Court* (2013) 219 Cal.App.4th 409, 423.)  For example, the Act limits involuntary commitment to successive periods of increasingly longer duration, beginning with a 72-hour detention for evaluation and treatment.  (§ 5150; *Sorenson*, at p. 423.)  Commitments longer than the initial 72-hour detention require a certification hearing before an appointed hearing officer to determine whether there is probable cause for confinement, unless the detainee has filed a petition for writ of habeas corpus. (§§ 5256, 5256.1, 5262, 5270.15, 5275, 5276; see *Sorenson*, at pp.

13

423-424.)  A 180-day commitment requires a court order. (§ 5301.)

Section 5150, the statute primarily at issue in this case, allows law enforcement officers and various medical professionals to bring an individual to an appropriate facility for assessment, evaluation, and treatment for up to 72 hours where there is "'probable cause to believe that the person is, as a result of mental disorder, a danger to others, or to himself or herself, or gravely disabled.'" (*Jacobs v. Grossmont Hospital* (2003) 108 Cal.App.4th 69, 74; see *Coburn*, *supra*, 133 Cal.App.4th at p. 1493.)  "A broad range of personnel—including peace officers, members of the staff of the evaluation facility, designated members of a mobile crisis team, and other professional persons designated by the county—can initiate the placement of a mentally disordered person for the 72-hour evaluation." (*Coburn*, at p. 1493; see *Ford v. Norton* (2001) 89 Cal.App.4th 974, 979.)

When a peace officer takes a person into custody under section 5150 and presents that person to a facility designated by the county for evaluation and treatment, the officer must provide a written application describing the circumstances that brought the person's condition to the officer's attention and stating the officer "has probable cause to believe that the person is, as a result of a mental health disorder, a danger to others, or to himself or herself, or gravely disabled."  (§ 5150, subd. (e).)  In determining whether there is probable cause, a person authorized to make that determination may consider "available relevant information about the historical course of the person's mental disorder" (§ 5150.05, subd. (a)) and "shall not be limited to

14

consideration of the danger of imminent harm" (§ 5150, subd. (b)).[6]

Before admitting a person into a designated facility, "the professional person in charge of the facility or his or her designee shall assess the individual in person to determine the appropriateness of the involuntary detention." (§ 5151.) "If, in the judgment of the professional person in charge of the facility designated by the county for evaluation and treatment [or other authorized individuals] the person cannot be properly served without being detained, the admitting facility shall require an application in writing stating the circumstances under which the person's condition was called to the [facility's] attention . . . and stating that [the facility] has probable cause [to detain the person]." (§ 5150, subd. (e).) "Once admitted to a facility for a 72-hour detention, the detainee 'shall receive an evaluation as soon after he or she is admitted as possible.' (§§ 5152, subd. (a), 5008, subd. (a) ['evaluation' defined].) In addition, the detainee 'shall receive whatever treatment and care his or her condition requires for the full period that he or she is held.' (§ 5152, subd. (a).) A person subject to 72-hour detention can be released early, released after the lapse of 72 hours, certified for an additional 14 days of intensive treatment, or placed under the control of an appointed conservator. (§§ 5152, subds. (a) & (b), 5250.) An early release from a 72-hour commitment may occur 'only if . . . the psychiatrist directly responsible for the person's treatment

---

[6]    The Legislature added section 5150, subdivision (b), in 2015 (effective Jan. 1, 2016) after Julian filed her third amended complaint. (See Stats. 2015, ch. 570, § 1.) In all other respects, the current statute is identical to the statute in effect at the time Julian filed the third amended complaint.

15

believes, as a result of his or her personal observations, that the person no longer requires evaluation or treatment.' (§§ 5152, subd. (a) [mentally disordered persons], 5172, subd. (a) [inebriated persons].)" (*Coburn*, *supra*, 133 Cal.App.4th at p. 1493; see *Ford*, *supra*, 89 Cal.App.4th at p. 979.)

"Consistent with the goals of the [Act], the decision to detain a person involuntarily for 72 hours requires the careful exercise of judgment in evaluating whether, as a result of mental disorder, a person poses a danger to others, or to himself or herself." (*Jacobs*, *supra*, 108 Cal.App.4th at pp. 75-76.) Section 5278 provides immunity to individuals who exercise this authority in accordance with the law. This immunity "allows individuals authorized to detain a person for 72-hour treatment and evaluation to make that decision without fear of exposure to criminal or civil liability." (*Jacobs*, at p. 76.) "The prospect of liability for initiating a 72-hour hold would frustrate and impede the Legislature's intent to provide prompt evaluation and treatment for the mentally ill and to ensure public safety. Thus, the immunity of section 5278 necessarily applies to individuals or entities who make the decision to detain, when that decision is supported by probable cause." (*Ibid.*; see *Cruze v. National Psychiatric Services, Inc.* (2003) 105 Cal.App.4th 48, 56 [section 5278 applies to individuals and entities].)

C.      *The Act Does Not Create a Private Right of Action for the Violations Alleged by Julian*

Julian titled her first cause of action "Statutory Violations Against All Police and Physician and the Hospital Defendants." In her the third amended complaint Julian listed a variety of alleged violations of the Act, including that the police officers

16

"concocted a situation and falsely reported *probable cause* pursuant to [sections] 5150, 5157 and 5328," and she alleged the hospital defendants "failed to review the false statement of *probable cause* submitted by the police defendants and determine the obvious point that [Julian] did not meet the criteria for detention and should have been rejected immediately as required by [sections] 5150, 5150.05, and 5151." Julian also alleged the hospital defendants failed to assess and evaluate her in accordance with sections 5150, subdivision (b), 5150.4, and 5152, subdivision (a), and failed to provide her with a written statement of her rights pursuant to section 5325. With regard to Dr. Shirazi, Julian alleged he should not have treated her because he was not designated by the hospital at that time to assess potential detainees, he failed to assess and evaluate her as soon as possible after her admission pursuant to sections 5150, subdivision (b), 5150.4, and 5152, subdivision (a), and he prescribed medication contrary to the requirements of sections 5325.2, 5326.2, 5326.5, 5327, and 5332.

The hospital defendants argue the Act does not create a private right of action for these violations. The hospital defendants (and the school defendants), however, did not raise this issue in the trial court, and the trial court's order sustaining the hospital defendants' demurrers did not address it. We may nevertheless consider an issue raised for the first time on appeal "'when [it] involves purely a legal question which rests on an uncontraverted record which could not have been altered by the presentation of additional evidence.'" (*Noe v. Superior Court* (2015) 237 Cal.App.4th 316, 335; accord, *Sanowicz v. Bacal* (2015) 234 Cal.App.4th 1027, 1042-1043; *Kramer v. Intuit Inc.* (2004) 121 Cal.App.4th 574, 578; see *Ivanoff v. Bank of America,*

17

*N.A.*, *supra*, 9 Cal.App.5th at p. 732, fn. 2 ["[a]lthough an issue not raised in the trial court is typically forfeited, we can reach a ground for demurrer not raised below if it presents a pure question of law and the parties have been given an opportunity to address it"].)

Whether the Act creates a private right of action to enforce the provisions Julian claims the defendants violated "is a pure question of law that does not turn on disputed facts or evidence." (*Noe*, *supra*, 237 Cal.App.4th at p. 336; see *Shamsian v. Department of Conservation* (2006) 136 Cal.App.4th 621, 631 ["whether [a statute] . . . supports a private right of action is a question of statutory interpretation and of law for the court"].)[7] And the hospital defendants and Julian have briefed the issue on

_____

[7] There are no published decisions addressing whether private parties may sue for violations of the statutes Julian alleges the defendants violated. The court in *Jackson v. Cedars-Sinai Medical Center* (1990) 220 Cal.App.3d 1315 declined to decide whether the Act creates a private right of action for violation of sections 5150, 5250, 5325.1, and 5326.2. (See *Jackson*, at p. 1319, fn. 7.) In that case the court held the "Act did not create liability for wrongfully admitting mental patients" (*id.* at p. 1322) and the one-year statute of limitations under Code of Civil Procedure section 340 governing certain tort actions, rather than the three-year statute of limitations under Code of Civil Procedure section 338 governing statutory liability, applied to the plaintiff's alleged statutory violations (*id.* at pp. 1319-1322). Because the plaintiff filed suit beyond the one-year statute of limitations, the court affirmed dismissal of the action. (See also *Harvey v. Alameda County Medical Center* (N.D. Cal. 2003) 280 F.Supp.2d 960, 980 [declining to exercise supplemental jurisdiction over a claim based on the Act because whether the Act creates a private cause of action is "a novel issue of California law"], affd. (9th Cir. 2005) 123 Fed. Appx. 823.)

18

appeal. (See, e.g., *Ivanoff v. Bank of America, N.A.*, *supra*, 9 Cal.App.5th at p. 732, fn. 2 [considering a new legal issue on appeal from an order sustaining a demurrer where the court "invited supplemental letter briefs from the parties" on the issue]; *Noe*, at p. 336 [considering new legal issue on appeal from summary judgment where the parties fully briefed the issue].) Therefore, we consider the issue.

### 1. *Governing Law*

"A violation of a state statute does not necessarily give rise to a private cause of action. [Citation.] Instead, whether a party has a right to sue depends on whether the Legislature has 'manifested an intent to create such a private cause of action' under the statute. [Citations.] Such legislative intent, if any, is revealed through the language of the statute and its legislative history." (*Lu v. Hawaiian Gardens Casino, Inc.* (2010) 50 Cal.4th 592, 596; see *Noe*, *supra*, 237 Cal.App.4th at p. 336.) "'[W]e consider the statute's language first, as it is the best indicator of whether a private right to sue exists.' [Citation.] 'A statute may contain "'clear, understandable, unmistakable terms,'" which strongly and directly indicate that the Legislature intended to create a private cause of action. [Citation.] For instance, the statute may expressly state that a person has or is liable [*sic*] for a cause of action for a particular violation. [Citations.] Or, more commonly, a statute may refer to a remedy or means of enforcing its substantive provisions, i.e., by way of an action.'" (*Noe*, at p. 336, "[*sic*]" in original; see *Lu*, at p. 597.) If the statute does not include explicit language regarding a private right of action, but contains provisions that create some ambiguity, courts may

19

look to legislative history "for greater insight." (*Lu*, at p. 598; see *Noe*, at p. 336.)

"'It is well settled that there is a private right of action to enforce a statute "only if the statutory language or legislative history affirmatively indicates such an intent. [Citations.] That intent need not necessarily be expressed explicitly, but if not it must be strongly implied."'" (*Noe*, *supra*, 237 Cal.App.4th at p. 337; see *Lu*, *supra*, 50 Cal.4th at p. 601, fn. 6 [courts will not find a private right of action unless the Legislature has "clearly manifest[ed] an intent to create a private cause of action under a statute"]; *Thurman v. Bayshore Transit Management, Inc.* (2012) 203 Cal.App.4th 1112, 1131-1132 ["[i]t is well settled that there is a private right of action to enforce a *statute* 'only if the statutory language or legislative history affirmatively indicates such an intent'"].) ""Particularly when regulatory statutes provide a comprehensive scheme for enforcement by an administrative agency, the courts ordinarily conclude that the Legislature intended the administrative remedy to be exclusive unless the statutory language or legislative history clearly indicates an intent to create a private right of action."'" (*Noe*, at p. 337; see *Thurman,* at p. 1132.)


2.      *Julian Did Not Allege a Violation Enforceable by a Private Right of Action Under the Act*

Julian alleged the defendants violated the following provisions of the Act: sections 5150, 5150.05, 5150.4, 5151, 5152, 5325, 5325.2, 5326.2, 5326.5, 5327, 5328, and 5332. None of these statutes includes ""clear, understandable, unmistakable terms"'" that "strongly and directly indicate that the Legislature intended to create a private cause of action" for the violations

20

Julian alleged.  (See *Lu, supra*, 50 Cal.4th at p. 597; *Noe, supra*, 237 Cal.App.4th at p. 336.)

Section 5150 expressly creates a private cause of action against a person who intentionally provides a knowingly false statement on which probable cause is based, but only against a person who (unlike a police officer or medical professional) is not authorized to detain someone under section 5150.  (§ 5150, subd. (e).)  Section 5150.05 recognizes a similar, limited cause of action.  (§ 5150.05, subd. (c).)  Julian did not sue any person other than a peace officer or medical professional for providing false information on which probable cause to detain her was based.

Sections 5150.4 and 5151 define "assessment," require the professional person in charge of a facility or his or her designee to assess an individual in person before admitting that individual to the facility, and specify that an individual admitted under section 5150 may be held for 72 hours.  These provisions do not refer to or expressly create any cause of action.  Section 5152, subdivision (a), requires each person admitted to a facility for 72-hour treatment and evaluation to receive an evaluation "as soon as possible after he or she is admitted."  Julian alleged this did not happen in her case, but neither subdivision (a) of section 5152 nor the other provisions of that section refer to or expressly create a cause of action.

Sections 5325 and 5327 establish and declare certain legal and civil rights of persons involuntarily detained under section 5150 and require facilities that provide evaluation and treatment to post a list of those rights in a prominent place.  Among the rights established by section 5325 are the rights for a patient to wear his or her own clothes, to keep and use his or her personal possessions, to see visitors, to have reasonable access to

21

telephones, and to refuse convulsive treatment.  (§ 5325, subds. (a)-(f).)  Section 5327 states that every person involuntarily detained under the Act is entitled to these rights and "shall retain all rights not specifically denied him."  Neither section 5325 nor section 5327 refers to or expressly creates a private cause of action.

Sections 5326.2 and 5326.5 define "voluntary informed consent" and "written informed consent" with regard to treatment and treatment options.  Neither provision refers to or expressly creates a cause of action.

Section 5328 provides that all information and records obtained in the course of providing services under the Act are confidential and prescribes the circumstances in which such information may be disclosed.  Section 5328 does not create a private cause of action.  Section 5330 does create a private right of action for damages against an individual who willfully and knowingly releases confidential information or records concerning him or her in violation of the Act, but Julian neither identifies this section as a basis for her cause of action nor alleges the police defendants (who she alleges violated section 5328) willfully and knowingly disclosed any confidential information about her.

Finally, section 5332 sets forth the circumstances in which antipsychotic medication may be administered to a person involuntarily detained under section 5150.  Again, this section neither refers to nor expressly creates a private right of action, and Julian does not allege she was actually administered any medication by the hospital defendants.[8]

---

[8]     Julian also alleged the police defendants violated section 5157, which the Legislature repealed before she filed her third amended complaint.  (See Stats. 2013, ch. 567, § 9.)  Section 5157

None of these provisions suggests an unmistakable legislative intent to create a private cause of action for any of the statutory violations Julian alleged. (See *Lu*, *supra*, 50 Cal.4th at p. 598 [concluding the statutory language in that case did not ""unmistakabl[y]"" reveal a legislative intent to provide . . . a private right to sue"].) A court may still find a private cause of action if the Act contains provisions creating some ambiguity regarding whether the Legislature intended to create a private right of action and the Act's legislative history affirmatively indicates such an intent. (See *Lu*, at p. 598; *Noe*, *supra*, 237 Cal.App.4th at pp. 336-337.) Julian, however, does not point to any such ambiguity in the relevant provisions of the Act or cite any such legislative history.

Julian argues the rights created by the Act "must be enforceable to be meaningful" and the statute's reference to a patient's attorney "27 times" in sections 5325 through 5337 "contemplates private enforcement." As noted, some provisions of the Act do create a private right of action, such as section 5150, subdivision (e), and section 5150.05, subdivision (c). These provisions, along with sections 5203, 5259.1, 5265, 5270.40, and 5330, create causes of action in specific circumstances not relevant here. Significantly, the fact the Legislature established private rights of action to remedy violations of these provisions, but not for violations of the provisions Julian alleged the

---

required the peace officer or mental health professional who took the individual into custody under section 5150 to give that individual certain information about his or her detention. It did not refer to or create a private cause of action. Some of the information previously required by section 5157 is now required under section 5150, subdivisions (g)-(i).

defendants violated, is a strong indication Julian does not have a private right of action for her claims under the Act. (See *Rosales v. City of Los Angeles* (2000) 82 Cal.App.4th 419, 427-428 [statutory scheme governing disclosure of police personnel records did not create a private right of action where the Legislature did not include such a right in the statute but did create private rights of action in similar contexts in other statutes (including § 5330)]; see also *Rosales*, at p. 428 ["[g]iven the comprehensiveness of the statutory scheme, the Legislature could have easily provided a remedy if one was intended"].)

In addition, the Act provides a means of enforcing the provisions Julian alleged the defendants violated, but not through a private cause of action. Instead, the Act sets forth a comprehensive scheme for its enforcement by the local director of mental health, the Director of Health Care Services, or the Director of State Hospitals, who may issue notices of violation to offending facilities, revoke a facility's designation and authorization to evaluate and treat persons detained involuntarily, and refer legal violations to a local district attorney or the Attorney General for prosecution. (See § 5326.9.) When legislation provides a comprehensive regulatory scheme for its enforcement, courts generally conclude the Legislature intended that remedy to be exclusive, unless the statutory language or legislative history "clearly indicates an intent to create a private right of action." (*Noe, supra*, 237 Cal.App.4th at p. 337; see *Thurman, supra*, 203 Cal.App.4th at p. 1132; see also *County of San Diego v. State* (2008) 164 Cal.App.4th 580, 610-611 ["[g]enerally, when a new right is created by statute, a party aggrieved by violation of the statute is limited to the statutory

24

remedy if one is provided"].)  Again, the statutes Julian cites have no such language or expression of legislative intent.

Moreover, aggrieved individuals can enforce the Act's provisions through other common law and statutory causes of action, such as negligence, medical malpractice, false imprisonment, assault, battery, declaratory relief, section 1983 for constitutional violations, and Civil Code section 52.1.  (See, e.g., *Gonzalez v. Paradise Valley Hospital* (2003) 111 Cal.App.4th 735 [negligence against a hospital and doctor arising out of the death of a detainee during an involuntary 72-hour hold under section 5150]; *Jacobs*, *supra*, 108 Cal.App.4th at p. 80 [negligence against hospital for injuries sustained in a trip and fall incident during a 72-hour hold under section 5150]; *Ford*, *supra*, 89 Cal.App.4th at p. 984 [malpractice against medical professionals who released the plaintiff before the end of the 72-hour period under the Act]; *Riese v. St. Mary's Hospital & Medical Center* (1987) 209 Cal.App.3d 1303 [class action seeking a declaration that patients involuntarily committed to mental health facilities must give informed consent to the use of antipsychotic drugs]; *Hall v. City of Fremont* (9th Cir. 2013) 520 Fed. Appx. 609 [assault, battery, intentional infliction of emotional distress, false arrest and imprisonment, and violation of section 1983 arising out of a detention under section 5150]; see also *Jackson v. Cedars-Sinai Medical Center* (1990) 220 Cal.App.3d 1315, 1322-1323 ["the involuntary hospitalization in a mental institution 'in violation of [a predecessor of the Act] constitutes false imprisonment,'" and "the use of force to accomplish an unlawful detention can give rise to liability for assault and battery"], italics omitted.)  Thus, the absence of a private right of action to enforce the provisions of the Act Julian alleged the defendants violated

did not leave her without remedies for those alleged violations. (See *Lu*, *supra*, 50 Cal.4th at p. 603; cf. *Skov v. U.S. Bank Nat. Assn.* (2012) 207 Cal.App.4th 690, 698 [recognizing a private right of action under Civil Code section 2923.5 where, "unlike in *Lu*, there are no statutes which provide either a penalty for noncompliance with section 2923.5 or designate any administrative agency with enforcement of the statute"].)[9]

Julian is correct that sections 5325 through 5337 refer to a patient's attorney numerous times, but only in contexts not relevant to Julian's claims. For example, section 5326.7 addresses the role of a patient's attorney in providing informed consent for convulsive treatments, and sections 5333 and 5334 concern capacity hearings to determine whether a patient should be administered antipsychotic medication against his or her will. Sections 5328 and 5326.1 address circumstances in which a patient's attorney may be authorized to receive a patient's confidential information and treatment records. None of these provisions implies a legislative intent to create a private right of action to enforce any provision of the Act Julian alleged the

_____

[9] Indeed, in all of the cases Julian cites that involved claims arising from alleged violations of the Act, the claims at issue were based on common law causes of action. (See, e.g., *Brumfield v. Munoz* (S.D.Cal., Oct. 23, 2008, No. 08 CV 0958 WQH (NLS)) 2008 WL 4748176 [negligence and malpractice]; *Jacobs*, *supra*, 108 Cal.App.4th 69 [negligence and premises liability]; *Cruze*, *supra*, 105 Cal.App.4th 48 [malpractice, negligence, false imprisonment, infliction of emotional distress, defamation, and other torts]; *Heater v. Southwood Psychiatric Center* (1996) 42 Cal.App.4th 1068 [false imprisonment, assault and battery, negligent and intentional infliction of emotional distress, medical malpractice, libel, and conspiracy].)

defendants violated.  Nor has Julian cited anything in the legislative history of the Act that suggests private persons may enforce those provisions.

Because the Act does not create a private right of action for violations of the provisions Julian alleged the defendants violated, she is not entitled to maintain her first cause of action for violations of the Act against any of the defendants.  Therefore, the trial court did not err in granting the school defendants' motion for summary adjudication on the first cause of action or in sustaining without leave to amend the hospital defendants' demurrers to that cause of action.[10]

> D.    *The Trial Court Properly Granted the School Defendants' Motion for Summary Judgment on Julian's Civil Rights Claims*

> 1.    Federal Civil Rights Claim

Julian's second cause of action alleged the school defendants violated her civil rights under the First, Fourth, and Ninth Amendments.  The trial court granted the school defendants' motion for summary adjudication on this cause of action, ruling they were entitled to qualified immunity for their "on-the-job judgment calls" and Julian failed to "point to published, dispositive case law that states 'a clearly established rule prohibiting the officer from acting as he did . . . [i]n the

---

[10]    Even if Julian could maintain a private right of action against the school defendants for violation of the Act, the school defendants would still be immune from liability under section 5278 because, as we will discuss, they had probable cause to detain Julian.

27

circumstances presented to [the] officer.'" The trial court also concluded undisputed evidence supported the school defendants' actions in placing Julian on a 72-hour hold under section 5150. Julian argues the trial court erred because there are triable issues of material fact regarding whether the school defendants had probable cause to detain her. According to Julian, "[t]here is a long list of controverted facts about whether anyone could rationally suspect [she] was acting bizarrely under the circumstances such that it warranted a review by a psychiatric facility to determine whether she was mentally disordered."

a.      *Governing law*

"Title 42 United States Code section 1983 provides in relevant part: 'Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.'" (*Arce v. County of Los Angeles* (2012) 211 Cal.App.4th 1455, 1472.) "'To state a claim under [section] 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law.' [Citation.] "'State courts look to federal law to determine what conduct will support an action under section 1983. [Citation.]' [Citation.] 'The threshold inquiry [in analyzing a section 1983 claim] is whether the evidence establishes that appellants have

been deprived of a constitutional right.""'" (*Arce*, at pp. 1472-1473.)

"[A] *state* is not a 'person' as that term is used in section 1983." (*Pierce v. San Mateo County Sheriff's Department* (2014) 232 Cal.App.4th 995, 1007; see *Will v. Michigan Department of State Police* (1989) 491 U.S. 58, 71.) Whether a government unit is considered an arm of the state is a federal question, "although one 'dependent on an analysis of state law.'" (*Pierce*, at p. 1009; see *McMillian v. Monroe County, Ala.* (1997) 520 U.S. 781, 786.)

Cities, counties, and local officers sued in their official capacity are "persons" for purposes of section 1983 and, "although they cannot be held vicariously liable under section 1983 for their subordinate officers' unlawful acts, they may be held directly liable for constitutional violations carried out under their own regulations, policies, customs, or usages by persons having 'final policymaking authority' over the actions at issue." (*Venegas v. County of Los Angeles* (2004) 32 Cal.4th 820, 829; see *McMillian v. Monroe County, supra*, 520 U.S. at pp. 784-785; *Monell v. Department of Social Services of the City of New York* (1978) 436 U.S. 658, 690-692.) Such actions "are commonly referred to as 'policy or custom' section 1983 cases against local governmental entities and local officials acting in their official capacity." (*Pierce, supra*, 232 Cal.App.4th at p. 1007.)

Officers of a state, city, or county sued in their individual capacity may be liable under section 1983 for violating an individual's constitutional rights. (*Venegas, supra*, 32 Cal.4th at pp. 829, 839.) Qualified immunity, however, "shields public officers from section 1983 actions unless the officer has violated a clearly established constitutional right" (*Mendoza v. City of West Covina* (2012) 206 Cal.App.4th 702, 711), which does not include

29

circumstances in which "reasonable officers in their position would have believed their actions were lawful under established law" (*Venegas*, at p. 839). (See *Saucier v. Katz* (2001) 533 U.S. 194, 201, overruled on other grounds by *Pearson v. Callahan* (2009) 555 U.S. 223, 236.)

"In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry." (*Tolan v. Cotton* (2014) __ U.S. __, __ [134 S.Ct. 1861, 1865].) "First, '[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right.' [Citation.] 'If no constitutional right would have been violated were the allegations established,' then the qualified immunity inquiry ends. [Citation.] However, 'if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established. This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad, general proposition.'" (*Mendoza*, *supra*, 206 Cal.App.4th at p. 711; see *Tolan v. Cotton*, *supra*, __ U.S. at p. __ [134 S.Ct. at pp. 1865-1866].) The "first step analyzes whether a constitutional right was violated, which is a question of fact. The second examines whether the right was clearly established, which is a question of law. Step two serves the aim of refining the legal standard and is solely a question of law for the judge." (*Tortu v. Las Vegas Metropolitan Police Dept.* (9th Cir. 2009) 556 F.3d 1075, 1085; see *Dunn v. Castro* (9th Cir. 2010) 621 F.3d 1196, 1199.)

"A right is clearly established only if its contours are sufficiently clear that 'a reasonable official would understand that what he is doing violates that right.' [Citation.] In other

words, 'existing precedent must have placed the statutory or constitutional question beyond debate.' [Citation.] This doctrine 'gives government officials breathing room to make reasonable but mistaken judgments.'" (*Carroll v. Carman* (2014) __ U.S. __, __ [135 S.Ct. 348, 350]; see *Saucier, supra*, 533 U.S. at pp. 202, 206; *Marshall v. County of San Diego* (2015) 238 Cal.App.4th 1095, 1108.) "When properly applied, [qualified immunity] protects 'all but the plainly incompetent or those who knowingly violate the law.'" (*Ashcroft v. al-Kidd* (2011) 563 U.S. 731, 743; see *Carroll*, __ U.S. at p. __ [135 S.Ct. at p. 350]; see *Marshall*, at p. 1108.)

"[C]ourts have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first." (*Ashcroft, supra*, 563 U.S. at p. 735; see *Mendoza, supra*, 206 Cal.App.4th at p. 711, fn. 9.) And "[c]ourts should think carefully before expending 'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case'" (*Ashcroft*, at p. 735), especially in "cases in which the briefing of constitutional questions is woefully inadequate" (*Pearson, supra*, 555 U.S. at p. 239).

Although the United States Supreme Court has left "open the issue of the burden of persuasion . . . with respect to a defense of qualified immunity" (*Gomez v. Toledo* (1980) 446 U.S. 635, 642 (conc. opn. of Rehnquist, J.)), the Courts of Appeals generally agree that, on a defendant's motion for summary judgment, the plaintiff "bears the burden of showing that the right at issue was clearly established." (*Alston v. Read* (9th Cir. 2011) 663 F.3d 1094, 1098; see, e.g., *Keith v. Koerner* (10th Cir. 2016) 843 F.3d 833, 837; *Mendez v. Poitevent* (5th Cir. 2016) 823 F.3d 326, 331;

31

*Rivera-Corraliza v. Morales* (1st Cir. 2015) 794 F.3d 208, 214; *Hess v. Ables* (8th Cir. 2013) 714 F.3d 1048, 1051; *Morton v. Kirkwood* (11th Cir. 2013) 707 F.3d 1276, 1280-1281; *Donahue v. Gavin* (3d Cir. 2002) 280 F.3d 371, 378; *Sledd v. Lindsay* (7th Cir. 1996) 102 F.3d 282, 287.)

> b. *Julian did not state a section 1983 claim for constitutional violations against the LAUSD or LAUSP*

Julian does not argue LAUSD and LAUSP are local government units subject to liability under section 1983 for their policies or customs rather than state agencies that are not "persons" under the statute. Indeed, state and federal courts have uniformly held that California school districts, including LAUSD, are state agencies and thus not "persons" for purposes of section 1983. (See, e.g., *McAllister v. Los Angeles Unified School District* (2013) 216 Cal.App.4th 1198, 1207; *Kirchmann v. Lake Elsinore Unified School Dist.* (2000) 83 Cal.App.4th 1098, 1115; *C.W. v. Capistrano Unified School Dist.* (9th Cir.2015) 784 F.3d 1237, 1247; *Belanger v. Madera Unified School Dist.* (9th Cir. 1992) 963 F.2d 248, 253; *Sato v. Orange County Dept. of Education* (C.D.Cal., July 6, 2015, No. SACV 15-00311-JLS) 2015 WL 4078195, at p. 5 [citing cases].) Julian alleges, and LAUSD concedes, LAUSP "is a division of the LAUSD." Thus, it also operates as an arm of the state and is not a "person" under section 1983.

Even if the LAUSD and LAUSP were "persons" for purposes of section 1983, Julian did not state a claim against them. Government entities are liable under section 1983 only where their "regulations, policies, customs, or usages by persons

having 'final policymaking authority'" violate another's constitutional rights.  (*Venegas*, *supra*, 32 Cal.4th at p. 829; see *Monell*, *supra*, 436 U.S. 658 at pp. 690-692.)  Julian's third amended complaint did not identify any such regulation, policy, or custom that allegedly violated the constitutional rights Julian identifies.  Therefore, the trial court properly granted summary adjudication on this cause of action against LAUSD and LAUSP.

> c.  *Julian did not state a section 1983 claim for constitutional violations against the individual police defendants*

Julian alleged three federal constitutional violations against the individual police defendants.  They were (1) violation of her First Amendment right "to speak out about the wrongful actions of the police department without being coerced into silence by means of falsely labeling her as a person with a mental disorder and dangerous"; (2) violation of her Fourth Amendment right "to be free from seizure and or detention absent a warrant or other established legal justification properly applied"; and (3) violation of her "*Unenumerated* Ninth Amendment right . . . to be properly cared for by physicians when in custody."

With regard to the alleged First Amendment violation, Julian alleged no facts suggesting she was ever "silence[d]."  In fact, Julian alleged and the uncontested evidence showed she spoke and even screamed throughout much of her encounter with the police defendants.  With respect to Julian's alleged Ninth Amendment violation, Julian cites no case establishing a right under that constitutional provision "to be properly cared for by physicians when in custody."  In any event, it is unclear how the police defendants, who Julian did not allege are physicians or

33

acted as physicians under the color of law, could have violated any such right.

Julian did have a constitutional right under the Fourth Amendment to be free from involuntary detention without probable cause. (*Bias v. Moynihan* (9th. Cir. 2007) 508 F.3d 1212, 1220; see *People v. Triplett* (1983) 144 Cal.App.3d 283, 287 & fn. 6 [involuntary detention pursuant to section 5150 without probable cause may violate the Fourth Amendment].) Therefore, the issue is whether the undisputed facts demonstrated that a reasonable officer would have believed there was probable cause to detain Julian under section 5150. (See *Bias*, at pp. 1219-1220.)

"Probable cause exists under section 5150 if facts are known to the officer 'that would lead a person of ordinary care and prudence to believe, or to entertain a strong suspicion, that the person detained is mentally disordered and is a danger to himself or herself.'" (*Bias, supra*, 508 F.3d at p. 1220; see *Heater v. Southwood Psychiatric Center* (1996) 42 Cal.App.4th 1068, 1080; *Triplett, supra*, 144 Cal.App.3d at pp. 287-288.) "To justify the detention, the officer must point to 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant his or her belief or suspicion.'" (*Bias*, at p. 1220; see *Triplett*, at p. 288.) "'Each case must be decided on the facts and circumstances presented to the officer at the time of the detention and the officer is justified in taking into account the past conduct, character, and reputation of the detainee.'" (*Bias*, at p. 1220; see *Triplett*, at pp. 287, fn. 6 & 288.) In determining whether there is probable cause, "[a] peace officer . . . is not required to make a medical diagnosis of mental disorder. It is sufficient if the officer, as a lay person, can articulate behavioral symptoms of mental disorder . . . . [G]enerally, mental disorder

34

might be exhibited if a person's thought processes, as evidenced by words or actions or emotional affect, are bizarre or inappropriate for the circumstances." (*Triplett*, at p. 288.)

Here, prior to detaining Julian, Sergeant Taylor learned Julian had told a close friend she was going to slit her wrists, Julian had marks on her wrists Sergeant Taylor believed may have evidenced previous suicide attempts, and Julian could be suicidal. Because he was aware Julian disliked Officer Valencia, Sergeant Taylor and Castro agreed to approach Julian without Officer Valencia. When they did, Julian dropped to the floor and screamed "get away from me," even though Castro told her they were there only to get a statement from her about the assault she had reported. Sergeant Taylor asked Julian to calm down and told her she was safe, but she began screaming "even louder." Sergeant Taylor called for an ambulance because he had concluded Julian was a danger to herself and the children and employees at the school. The application for a 72-hour detention that Officer Valencia presented to the hospital summarized these facts, stating Julian "went out of control" when the school police approached her about a criminal investigation, had previously "made statements to [an]other school staff member that she wanted to cut her wrist," and had "6 to 8 cuts" on her wrists.

These uncontested facts support a finding of probable cause.[11] (See *Triplett*, *supra*, 144 Cal.App.3d at p. 288 ["obvious

---

[11] Julian contends that probable cause cannot be determined on summary judgment, but does not cite any case in support of this contention. Many cases hold otherwise. (See, e.g., *Cruze*, *supra*, 105 Cal.App.4th at p. 58; *Bias*, *supra*, 508 F.3d at p. 1221; *Palter v. City of Garden Grove* (9th Cir. 2007) 237 Fed. Appx. 170, 172.)

physical signs of a recent suicide attempt" coupled with the detainee's intoxication and "tearful" condition "would lead any person of ordinary care and prudence to believe that [the detainee] as a result of mental disorder was a danger to herself"]; *Bias*, *supra*, 508 F.3d at p. 1221 [probable cause existed where the detainee alluded to suicide and paranoid thoughts, and later "became combative" and grabbed an officer while appearing "visibly angry" and "agitated"]; *Palter v. City of Garden Grove* (9th Cir. 2007) 237 Fed. Appx. 170, 172 [probable cause existed where a neighbor told an officer the detainee alluded to suicide, had a gun, and was going to his daughter's home to leave a "goodbye" note, even though the detainee told the officer he did not intend to hurt himself and did not have a gun].) "Probable cause does not mean certain cause, and the purpose of the psychiatric evaluation [under section 5150] is to have professionals skilled at evaluating mental state take some responsibility for assessing whether [a detainee] was in danger." (*Palter*, at p. 172.) Sergeant Taylor had probable cause under the totality of the circumstances to believe Julian was a danger to herself and others and to detain her so that medical professionals could assess her.

Julian argues that "a long list of controverted facts" precluded summary judgment. For example, she points out Castro had "discounted" the text message Ibrahim sent to Castro stating that Julian wanted to "slit her wrists." Julian, however, does not dispute Castro shared the text message with an LAUSD crisis counselor who in turn shared it with Sergeant Taylor, nor does Julian dispute Sergeant Taylor properly took that text message into account in determining whether there was probable cause to detain Julian. (See *Bias*, *supra*, 508 F.3d at p. 1220 [in

36

determining probable cause, an officer may consider the detainee's past conduct, character, and reputation]; accord, *Triplett*, *supra*, 144 Cal.App.3d at pp. 287-288 & fn. 6.) Even if Castro discounted the text message, that did not preclude Sergeant Taylor from taking the text message into account in evaluating Julian's mental state. And Castro did not entirely discount Julian's text; she told LAUSD's crisis counselor about it despite having previously concluded Julian was not suicidal. (See *Bias*, at p. 1219 [rejecting the detainee's argument that the court should construe a letter stating "I shall kill myself" as hyperbole because the statement was not presented as a joke or a figure of speech].)

Similarly, Julian repeatedly relies on her assertion the scratches on her arms were made by her cats and were not evidence of past suicide attempts. While Julian might have known the scratches were from her cats, she presented no evidence Castro, LAUSD's crisis counselor, or Sergeant Taylor knew they were. And Julian could have said her cats scratched her and actually made the marks herself. Indeed, a person of ordinary care and prudence easily could have concluded or entertained a strong suspicion the scratches were "hesitation marks," which result "when a person contemplating suicide cuts his or her wrist to see how much pain is involved." (*Triplett*, *supra*, 144 Cal.App.3d at p. 285; see *People v. Lightsey* (2012) 54 Cal.4th 668, 675 ["superficial 'hesitation wounds'" indicated the decedent may have committed suicide]; *People v. Steele* (2002) 27 Cal.4th 1230, 1275 [wounds indicating hesitation are suggestive of suicide rather than homicide].) Julian states the difference between her cat scratches and "recently self inflicted cuts was obvious," but her self-assessment does not negate the fact that a

reasonable person in Sergeant Taylor's position could have concluded otherwise and reasonably construed the scratches on her arms as evidence of a suicidal tendency.

Julian also contends that the school police knew of her fears of police in general and of a prior incident where she "responded in a similar fashion at the school, sitting against the wall to assure her safety," and that the police "acted pursuant to their own plan founded upon some irrational prejudice in their thinking." Julian essentially argues the school police conspired to detain her involuntarily by "fabricating a situation." Although it is unclear whether Julian intended to allege civil conspiracy under California state law or conspiracy to violate her constitutional rights, in either case her allegations of a conspiracy are not actionable.

Under California law, "[t]here is no separate tort of civil conspiracy and no action for conspiracy to commit a tort unless the underlying tort is committed and damage results therefrom." (*Prakashpalan v. Engstrom, Lipscomb and Lack* (2014) 223 Cal.App.4th 1105, 1136; accord, *Kenne v. Stennis* (2014) 230 Cal.App.4th 953, 968; see *Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1062 [stating the elements of civil conspiracy].) Similarly, under federal law, a conspiracy, even if established, "does not give rise to liability under [section] 1983 unless there is an actual deprivation of civil rights" resulting from the conspiracy. (*Woodrum v. Woodward County, Okl.* (9th Cir. 1989) 866 F.2d 1121, 1126; see *Hernandez v. City of Napa* (N.D. Cal. 2011) 781 F.Supp.2d 975, 997.) Because ultimately Julian did not allege any state tort cause of action and cannot show any actual deprivation of her constitutional rights resulted from the alleged conspiracy, the alleged conspiracy is not actionable. (See *Kenne*,

at pp. 968-969 ["a bare conspiracy, without the commission of some underlying tort by a coconspirator is not actionable"]; *Woodrum*, at p. 1126 [plaintiffs cannot succeed on conspiracy claim without establishing a violation of their constitutional rights]; see also *Hart v. Parks* (9th Cir. 2006) 450 F.3d 1059, 1071 [affirming summary judgment on a claim that officers conspired to violate the plaintiff's constitutional rights where the officers had probable cause to arrest him].)[12]

### 2. State Civil Rights Claims

Julian's third cause of action alleged two causes of action, one based on alleged violations of the California Constitution and

---

[12] In addition to arguing these facts undermine the trial court's conclusion that the police defendants had probable cause to detain Julian, Julian's briefs cite various pages of her opposition to the motion for summary judgment, her separate statement, and her declaration in the trial court. As the appellant, however, Julian has the burden to demonstrate error by "'presenting legal authority on each point made and factual analysis, supported by appropriate citations to the material facts in the record; otherwise, the argument may be deemed forfeited.'" (*Salehi v. Surfside III Condominium Owners' Assn.* (2011) 200 Cal.App.4th 1146, 1161-1162; accord, *Keyes v. Bowen* (2010) 189 Cal.App.4th 647, 655-656.) Julian may not simply "'incorporate by reference arguments made in papers filed in the trial court, rather than briefing them on appeal.'" (*Salehi*, at p. 1162; see *Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 294, fn. 20 ["[i]t is well settled that the Court of Appeal does not permit incorporation by reference of documents filed in the trial court"]; *Colores v. Board of Trustees* (2003) 105 Cal.App.4th 1293, 1301, fn. 2 ["it is not appropriate to incorporate by reference, into a brief, points and authorities contained in trial court papers, even if such papers are made a part of the appellate record"].)

39

one based on Civil Code section 52.1, the Tom Bane Civil Rights Act (the Bane Act). (See *Shoyoye v. County of Los Angeles* (2012) 203 Cal.App.4th 947, 950.) She alleged (1) the school defendants violated her civil rights under the California Constitution, including by violating article I, sections 1, 2, 3, 7, and 13; and (2) the school police defendants interfered or attempted to interfere by threats, intimidation or coercion, with Julian's exercise or enjoyment of her state and federal constitutional rights and other legal rights as alleged in her complaint.

The trial court granted the school defendants' motion for summary adjudication on this cause of action, ruling they were immune from civil liability under section 5278 and Government Code 821.6. Julian argues that the school defendants are not immune under section 5278 because they did not exercise their authority "in accordance with the law" as required by that statute, and that factual disputes precluded summary judgment on the basis of Government Code section 821.6.

### a. *Alleged state constitutional violations*

There is no cause of action for damages for alleged violations of California Constitution, article I, section 2, subdivision (a) (freedom of speech), article I, section 3, subdivision (a) (right to petition the government),[13] or article I, section 7, subdivision (a) (due process and equal protection), when such an action is not tied to an established common law or

---

[13] Article I, section 3, subdivision (b), provides for the right to have access to information concerning the conduct of the people's business. Julian did not allege any facts that would constitute a violation of this right even if it provided for a private cause of action for damages.

40

statutory action, and Julian alleges no such cause of action. (See *Degrassi v. Cook* (2002) 29 Cal.4th 333, 335 & fn. 1 [freedom of speech]; *Katzberg v. Regents of University of California* (2002) 29 Cal.4th 300, 303 & fn. 1, 321 [due process and equal protection]; *McAllister*, *supra*, 216 Cal.App.4th at p. 1215 [freedom of speech]; *MHC Financing Ltd. Partnership Two v. City of Santee* (2010) 182 Cal.App.4th 1169, 1188 [right to petition]; *Javor v. Taggart* (2002) 98 Cal.App.4th 795, 807 [due process and equal protection].)

Whether there is a cause of action for damages for violations of the right to privacy under article I, section 1, of the California Constitution is not entirely settled. (Compare *Hernandez v. Hillsides, Inc.* (2009) 47 Cal.4th 272, 286 [citing *Katzberg* for the proposition "it is an open question whether the state constitutional privacy provision, which is otherwise self-executing and serves as the basis for injunctive relief, can also provide direct and sole support for a damages claim"] with *Clausing v. San Francisco Unified School Dist.* (1990) 221 Cal.App.3d 1224, 1238 [holding there is no cause of action for damages under article I, section 1, because that provision does not impose a mandatory duty on public entities to protect a citizen's right to privacy].) In any event, Julian failed to state the elements of a cause of action for invasion of privacy: a legally protected privacy interest in which she has a reasonable expectation of privacy under the circumstances and a serious invasion of that privacy interest. (See *Sheehan v. San Francisco 49ers, Ltd.* (2009) 45 Cal.4th 992, 998; *Hill v. National Collegiate Athletic Association* (1994) 7 Cal.4th 1, 35-37.) Therefore, the trial court did not err in granting summary adjudication on

Julian's cause of action for damages against the school defendants under article I, sections 1, 2, 3, and 7.

The California Supreme Court has also not decided whether there is a private cause of action for damages under article I, section 13, which protects against unreasonable searches and seizures, and federal courts are divided on this question.  (See *Smith v. County of Los Angeles* (C.D.Cal. Mar. 25, 2015, No. CV 11-10666 DDP (PJWx)) 2015 WL 1383539, at p. 7 ["[a]s to art. 1, § 13, the Court recognizes that there is a split of authority as to whether the provision is 'self-executing,' in the sense of providing a freestanding cause of action for damages," and citing cases]; *OSJ PEP Tennessee LLC v. Harris* (C.D.Cal. Oct. 7, 2014, No. CV 14-03741 DDP (MANx)) 2014 WL 4988070, at p. 6 ["[f]ederal courts in California have reached contradictory conclusions about whether such a tort based on [section] 13 actually exists," and citing cases].)  We need not decide that question here because, even if there is a cause of action for damages under article 1, section 13, the school defendants would be immune from liability under section 5278.

Section 5278 provides in part:  "Individuals authorized under this part to detain a person for 72-hour treatment and evaluation pursuant to Article 1 (commencing with Section 5150) . . . shall not be held either criminally or civilly liable for exercising this authority in accordance with the law."  Julian did not allege the school defendants were not authorized to detain her under section 5150.  She alleged they exercised their authority outside the bounds of the law by detaining her without probable cause.

The immunity under section 5278 is not absolute.  In enacting the statute, the Legislature "intended to provide

42

immunity for claims based on conduct that is expressly authorized by the [Act] but would otherwise constitute a civil or criminal wrong." (*Jacobs*, *supra*, 108 Cal.App.4th at p. 78.) Thus, "the scope of section 5278 immunity extends to claims based on facts that are inherent in an involuntary detention pursuant to section 5150. If there is probable cause for the detention, the statute therefore provides immunity for the decision to detain as well as for the detention and its inherent attributes, including the fact that the patient must necessarily be evaluated and treated without consent. These are all inherent aspects of the statutory scheme and thus cannot provide the basis for a civil suit." (*Jacobs*, at pp. 78-79.) The "protected conduct," however, "is confined to the *exercise* of statutory authority to detain, evaluate and treat against the patient's wishes, and does not extend to the *manner* in which evaluation and treatment are carried out." (*Gonzalez*, *supra*, 111 Cal.App.4th at p. 741.) Thus, immunity under section 5278 does not extend to "negligent acts, intentional torts, or criminal wrongs committed during the course of the detention, evaluation, or treatment." (*Gonzales*, at p. 742; see also *Jacobs*, at p. 79.)

Julian alleged her detention was improper because the school defendants lacked probable cause, the police officers "fabricated" the circumstances in which they detained her, and the officers used excessive force in restraining her. As explained, however, the police defendants had probable cause to detain Julian, and neither the complaint nor Julian's briefs explain how the police defendants used excessive force, except to argue that the use of any force was excessive because the school defendants lacked probable cause.

With regard to the alleged conspiracy, Julian's allegations and arguments contradict evidence she submitted in opposition to the motion for summary judgment and fail to sufficiently allege a conspiracy. In particular, the so-called "Castro timeline" Julian attached to her declaration states that Officer Valencia, contrary to "orchestrating" any conspiracy, voluntarily recused herself from questioning Julian and asked the school police to call in another officer because she knew Julian disliked her. When Castro learned the identity of the replacement officer, she asked Officer Valencia to call for yet another replacement because Castro "knew [Julian] had a previous incident with [that officer] and [she] would upset her even more if he came to take her report." Officer Valencia agreed, and Sergeant Taylor arrived to question Julian. Julian alleged the five officers who detained her somehow colluded before the detention and agreed to call an ambulance in advance, but she did not contradict the evidence showing that, to the contrary, the decision to question her was made by Castro, the LAUSD crisis counselor, and Sergeant Taylor.

Moreover, Julian submitted no evidence explaining when, how, or why this conspiracy came into existence. Indeed, it was Julian who set the events of the day in motion by lodging a complaint against another teacher. "For liability to attach [for a civil conspiracy], knowledge of the planned tort must be combined with intent to aid in its commission. [Citation.] 'While knowledge and intent "may be inferred from the nature of the acts done, the relation of the parties, the interest of the alleged conspirators, and other circumstances" [citation], "'[c]onspiracies cannot be established by suspicions. There must be some evidence. Mere association does not make a conspiracy. There

44

must be evidence of some participation or interest in the commission of the offense.""" (*Contreras v. Dowling* (2016) 4 Cal.App.5th 774, 795; accord, *Kidron v. Movie Acquisition Corp.* (1995) 40 Cal.App.4th 1571, 1582; see Code Civ. Proc., § 437c, subd. (p)(2) ["[t]he plaintiff . . . shall not rely upon the allegations . . . of its pleadings to show that a triable issue of material fact exists but, instead, shall set forth the specific facts showing that a triable issue of material fact exists as to the cause of action"].) Neither Julian's allegations nor the evidence she submitted in opposition to the school defendants' motion for summary judgment suggested any conspiracy to detain her.

Because the school defendants had probable cause to detain Julian and there was no triable issue of fact regarding whether the school defendants exercised their authority in accordance with the law, they are immune from liability for any violation of Julian's right to be free from unreasonable searches and seizures under article 1, section 13 of the California Constitution. The trial court properly granted summary adjudication on this cause of action.

b.      *Alleged Bane Act violations*

Julian also alleged the individual police officers violated the Bane Act by improperly interfering with her constitutional rights through threats, intimidation, or coercion. Civil Code section 52.1 provides a private right of action for damages against any person, "whether or not acting under color of law," who "interferes" or "attempts to interfere by threat, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the

45

United States, or of the rights secured by the Constitution or laws [of California]."

"A defendant is liable [under the Bane Act] if he or she interfered with or attempted to interfere with the plaintiff's constitutional rights by the requisite threats, intimidation, or coercion." (*Shoyoye*, *supra*, 203 Cal.App.4th at p. 956; see *Venegas*, *supra*, 32 Cal.4th at pp. 841-843.) "[T]he statute was intended to address only egregious interferences with constitutional rights, not just any tort. The act of interference with a constitutional right must itself be deliberate or spiteful." (*Shoyoye*, at p. 959.) Thus, where the plaintiff alleges wrongful detention, the statute requires a showing of threatening conduct independent from the alleged wrongful detention. (*Ibid.*; see *Doe v. State* (2017) 8 Cal.App.5th 832, 842-843; *Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 69.) The plaintiff must show "the defendant interfered with or attempted to interfere with the plaintiff's legal right by threatening or committing violent acts." (*Doe v. State*, at p. 842; see *Austin B. v. Escondido Union School Dist.* (2007) 149 Cal.App.4th 860, 881-882; see generally *Jones v. Kmart Corp.* (1998) 17 Cal.4th 329, 334.) Speech is insufficient to establish the requisite threat unless it includes threat of violence. (*Shoyoye*, at p. 958, citing Civ. Code, § 52.1, subd. (j).)

Here, other than the actions necessary to detain Julian, which the police had probable cause to take, Julian alleged without explanation that the police defendants "engaged in tactics to scare" her. "[C]onclusory allegations of 'forcible' and 'coercive' interference with plaintiffs' constitutional rights are inadequate to state a cause of action for a violation of section 52.1." (*Allen*, *supra*, 234 Cal.App.4th at p. 69.) The trial court

46

properly granted summary adjudication on this cause of action as well.

>   E.     *The Trial Court Properly Sustained the Hospital*
>          *Defendants' Demurrers Without Leave To Amend*

The trial court sustained the hospital defendants' demurrers without leave to amend. The trial court concluded section 5278 barred Julian's claims against the hospital defendants, and the court ruled Julian failed to allege the hospital defendants acted under the color of law or had any role in violating Julian's civil rights. Julian challenges these rulings. We find no error.[14]

>   1.     Federal Civil Rights Claim

As noted, to state a claim under section 1983, the plaintiff must allege that a person acting under color of state law deprived him or her of a federally guaranteed right. (*Naffe v. Frey* (9th Cir. 2015) 789 F.3d 1030, 1035-1036; *Anderson v. Warner* (9th Cir. 2006) 451 F.3d 1063, 1067.) "While generally not applicable to private parties, a § 1983 action can lie against a private party when 'he is a willful participant in joint action with the State or its agents.'" (*Kirtley v. Rainey* (9th Cir. 2003) 326 F.3d 1088, 1092; accord *Peng v. Mei Chin Penghu* (9th Cir. 2003) 335 F.3d 970, 980.)

Federal law governs whether a private party is a state actor, and we review a trial court's resolution of this question de novo. (See *Caviness v. Horizon Community Learning Center,*

---

[14]  As noted, Julian's first cause of action for violation of the Act did not state a claim because there is no private right of action for the alleged violations.

*Inc.* (9th Cir. 2010) 590 F.3d 806, 811; *Lee v. Katz* (9th Cir. 2002) 276 F.3d 550, 553-554; see also *In re Christopher H.* (1991) 227 Cal.App.3d 1567, 1576 [federal law determines whether there has been state action for purposes of applying the Fourth Amendment].) "We start with the presumption that conduct by private actors is not state action." (*Florer v. Congregation Pidyon Shevuyim, N.A.* (9th Cir. 2011) 639 F.3d 916, 922; see *Sutton v. Providence St. Joseph Medical Center* (9th Cir. 1999) 192 F.3d 826, 835.) Julian had the burden of establishing that the hospital defendants were state actors. (*Florer*, at p. 922; see *Flagg Bros., Inc. v. Brooks* (1978) 436 U.S. 149, 156.)

Julian acknowledged the hospital defendants are private entities or individuals, but alleged they acted under color of law when they detained and assessed her. In particular, Julian alleged that the hospital acted under color of law because the County of Los Angeles designated the hospital as a facility authorized to accept and detain individuals under the Act, and that the hospital acted pursuant to this authority when it detained her. Julian alleged Dr. Shirazi acted under color of law "through the authority" of the hospital. The hospital defendants contend these allegations were insufficient to constitute acting under color of law.

The Ninth Circuit has articulated four tests for determining whether a private person acted under color of law: (1) the public function test, (2) the joint action test, (3) the government nexus test, and (4) the government coercion or compulsion test. (*Kirtley, supra*, 326 F.3d at p. 1092; *Franklin v. Fox* (9th Cir. 2002) 312 F.3d 423, 445.) "Satisfaction of any one test is sufficient to find state action, so long as no countervailing factor exists." (*Kirtley*, at p. 1092; accord, *Florer, supra*, 639 F.3d

48

at p. 924.) "'[N]o one fact can function as a necessary condition across the board for finding state action; nor is any set of circumstances absolutely sufficient, for there may be some countervailing reason against attributing activity to the government.'" (*Florer*, at p. 924; see *Brentwood Academy v. Tennessee Secondary School Athletic Assn.* (2001) 531 U.S. 288, 295-296.) Julian's allegations against the hospital defendants did not satisfy any of these tests.

Under the public function test, a private party's conduct constitutes state action when the private party exercises powers that are "'traditionally the exclusive prerogative of the State.'" (*Caviness*, *supra*, 590 F.3d at p. 814; see *Sturm v. El Camino Hospital* (N.D.Cal., Feb. 26, 2010, No. C-09-02324 RMW) 2010 WL 725563, at p. 3.) "'[W]hen private individuals or groups are endowed by the State with powers or functions governmental in nature, they become agencies or instrumentalities of the State and subject to its constitutional limitations.'" (*Florer*, *supra*, 639 F.3d at p. 924; see *Kirtley*, *supra*, 326 F.3d at p. 1093.) "[T]he fact that the government has granted a private entity certain powers and privileges under the law," however, "is insufficient to make the private entity's conduct state action." (*Sturm*, at p. 3; see *Caviness*, at p. 814.) Instead, the "challenged 'function at issue must be both traditionally and exclusively governmental.'" (*Caviness*, at p. 814.)

The allegations in Julian's complaint were insufficient to raise a reasonable inference that the detention, evaluation, and treatment of mentally disordered individuals are functions within the exclusive prerogative of the state. Indeed, the Act refined a system the Legislature originally enacted in 1957 in which private community hospitals could provide mental health

49

services, including by detaining, assessing, and treating certain individuals, without the involvement of any state official or entity. (See William M. Burke, *The Need for Reform in the California Civil Commitment Procedure* (1967) 19 Stan. L. Rev. 992, 1003-1004 [describing the Act's predecessor, the Short-Doyle Act].) That system continues under the Act. (See § 5150, subd. (a) [authorizing certain private persons, including a "professional person in charge of a facility designated by the county," to detain individuals]; § 5150, subd. (c) [authorizing certain private persons to "assess the [individual] to determine whether he or she can be properly served without being detained"].) Health and Safety Code section 1799.111 also allows a licensed general acute care hospital and any physician or surgeon providing emergency medical services in any department of such a hospital to detain a person under the circumstances described in section 5150 for up to 24 hours. Thus, under the Act, the detention, assessment, and treatment of mentally disordered persons is not within the exclusive province or prerogative of the state. (See generally *Doe v. Rosenberg* (S.D.N.Y. 1998) 996 F.Supp. 343, 356 ["[h]istory reveals that involuntary commitment has long been a private remedy, although subject to safeguards"]; Salter, Toward Community Mental Health: A History of State Policy in California, 1939-1969 (1978), p. 338 [the Act "allowed the community treatment system to detain an individual under certain conditions, for a total of 17 days without a court order; this gave the treatment group freedom to exercise professional judgment and to observe and treat an individual without court interference for a limited period"].)

Contrary to Julian's contention, the fact that state laws authorize and regulate such actions does not, without more,

50

transform private activity into state action. (See *Caviness*, *supra*, 590 F.3d at p. 814 [private corporation that operated a public charter school subject to state regulation was not a state actor merely because state law characterized all charter schools as "public schools"]; *Sturm*, *supra*, 2010 WL 725563 at p. 3 ["[b]y detaining plaintiff for mental health treatment and evaluation, the private parties involved did not exercise power that is 'traditionally the exclusive prerogative of the State'"]; see also *Doe v. Rosenberg, supra*, 996 F.Supp. at p. 356 ["[t]hat the State can authorize commitment through its *parens patriae* or police powers does not make it the exclusive prerogative of the State"].)

Under the joint action test, "'courts examine whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights.'" (*Franklin*, *supra*, 312 F.3d at p. 445.) "The test focuses on whether the state has '"so far insinuated itself into a position of interdependence with [the private actor] that [the private actor] must be recognized as a joint participant in the challenged activity."'" (*Ibid.*; see *Florer*, *supra*, 639 F.3d at p. 926; *Kirtley*, *supra*, 326 F.3d at p. 1093.) "A plaintiff may demonstrate joint action by proving the existence of a conspiracy or by showing that the private party was 'a willful participant in joint action with the State or its agents.'" (*Franklin*, at p. 445.)

Julian did not allege any joint action or conspiracy between state officials and the hospital defendants. She alleged only that the county designated the hospital as a facility that may hold individuals under section 5150 and that Dr. Shirazi treated her with the hospital's authorization. Such allegations were insufficient to transform the conduct of the hospital defendants

51

"into state action under the joint action test." (*Sturm, supra*, 2010 WL 725563 at p. 3.)

The government nexus test asks whether "'there is such a close nexus between the State and the challenged action that the seemingly private behavior may be fairly treated as that of the State itself.'" (*Kirtley, supra*, 326 F.3d at p. 1095; see *Brentwood Academy, supra*, 531 U.S. at p. 295.) It is similar to the joint action test in that both tests require that the state is "so far insinuated into a position of interdependence with the [private party] that it was a joint participant in the enterprise." (*Jackson v. Metropolitan Edison Co.* (1974) 419 U.S. 345, 351; see *Jensen v. Lane County* (9th Cir. 2000) 222 F.3d 570, 574 [referring to a dual "'close nexus/joint action' test"].) Julian's allegations failed to satisfy this test for the same reason they failed to satisfy the joint action test: She did not allege any joint action or interdependence between the hospital defendants and any government entity or official.

Finally, under the state compulsion test, the court considers "whether the coercive influence or 'significant encouragement' of the state effectively converts a private action into a government action." (*Kirtley, supra*, 326 F.3d at p. 1094; see *Sutton, supra*, 192 F.3d at pp. 836-837.) "The Supreme Court has repeatedly held that 'the mere fact that a business is subject to state regulation does not by itself convert its action into that of the State.'" (*Caviness, supra*, 590 F.3d at p. 816, quoting *American Manufacturers Mutual Insurance Co. v. Sullivan* (1999) 526 U.S. 40, 52.) Indeed, "[e]ven extensive government regulation of a private business is insufficient to make that business a state actor if the challenged conduct was 'not

52

compelled or even influenced by any state regulation.'" (*Caviness*, at p. 816.)

The state did not exercise coercive influence over, or provide significant encouragement to, the hospital defendants regarding their decision under section 5150 to detain and treat Julian or their manner in doing so. Section 5150 is permissive, not mandatory, because it provides that an authorized person "may, upon probable cause, take, or cause to be taken, the person into custody." (See *Sturm*, *supra*, 2010 WL 725563, at p. 2.) Section 5150 also allows a private physician to exercise his or her discretion to determine whether, "in the judgment of the professional person," an individual should be detained. (§ 5150, subds. (e), (f); see *Jacobs*, *supra*, 108 Cal.App.4th at pp. 75-76.) Thus, section 5150 "does not require or encourage 72-hour detentions and merely allows private parties to exercise their independent medical judgment regarding the need for treatment and evaluation." (*Sturm*, at p. 2; see also *Benn v. Universal Health System, Inc.* (3d Cir. 2004) 371 F.3d 165, 171 ["although the [Pennsylvania civil commitment law] permits a physician or other 'responsible party' to file an application for an emergency examination, we see nothing in the [law] that compels or even significantly encourages the filing of an application"]; *Harvey v. Harvey* (11th Cir. 1992) 949 F.2d 1127, 1130-1131 ["Georgia statutes neither compel nor encourage involuntary commitment, precluding [a private hospital] becoming a state actor by state compulsion"].) Indeed, Julian alleged the hospital defendants conducted an independent assessment to determine whether to detain her.

Julian contends the hospital defendants made the decision to hold her pursuant to substantive standards set forth in certain

53

state or county regulations and guidelines.  The authorities she cites, however, are only procedural guidelines for designating facilities and physicians under the Act, not substantive guidelines for determining whether or in what circumstances an individual may or must be detained.[15]  (See *Caviness*, 590 F.3d at p. 818 [no state compulsion or influence over charter school operator's personnel decisions even though the state had authority to review and approve the operator's personnel policies].)  Thus, the hospital defendants' decision to detain Julian did not qualify as state action under the state compulsion test.

Julian cites several cases in support of her argument that the hospital defendants' actions constituted state action, but most of those cases are distinguishable because they involved a state

---

[15]     Julian cites various regulations defining "psychiatrist" and "psychologist" and establishing procedures for the approval of facilities and professionals authorized under the Act.  (See Cal. Code Regs., tit. 9, §§ 622-625, 821, 821.1, 822.)  She also cites the Los Angeles County Department of Mental Health's LPS [Lanterman-Petris-Short Act] Designation Guidelines and Process for Facilities Within Los Angeles County (Guidelines) (available at http://file.lacounty.gov/SDSInter/dmh/242404_LPSDesignationGuidelines7thEd.revFeb.2016.pdf), which includes, for example, a requirement that designated facilities have policies regarding a variety of legal issues such as the initiation of 72-hour detentions.  (Guidelines, at § I.D.1.a.)  The Guidelines do not specify what that policy should be.  These regulations and policies do not constitute the type of substantive standards or procedural guidelines that "'could have compelled or influenced'" the hospital defendants' actions.  (*Caviness*, 590 F.3d at p. 818.)

hospital, state contractor, or public employee, or a plaintiff who succeeded in showing joint action between a private physician and a government employee. (See *Zinermon v. Burch* (1990) 494 U.S. 113, 118; *Ellis v. City of San Diego, Cal.* (9th Cir. 1999) 176 F.3d 1183, 1186; *Tewksbury v. Dowling* (E.D.N.Y. 2001) 169 F.Supp.2d 103, 110.)[16] Julian did not allege that the hospital defendants were government employees or contractors or that they undertook "a complex and deeply intertwined process" with government employees that would justify treating the hospital defendants as state actors. (*Jensen, supra*, 222 F.3d at p. 575.)

Julian also cites *Cummings v. Charter Hospital of Las Vegas, Inc.* (1995) 111 Nev. 639 [896 P.2d 1137], which held a private hospital and physician acted under color of law in detaining the plaintiff under Nevada's civil commitment law. (*Id.* at p. 651.) The Nevada Supreme Court in that case held that Nevada law "goes beyond mere regulation and authorizes the exercise by private persons of significant power over those alleged to be mentally ill." (*Ibid.*) The court did not cite or attempt to distinguish cases that have reached the opposite conclusion under similar circumstances. (See, e.g., *Ellison v. Garbarino* (6th Cir. 1995) 48 F.3d 192; *Rockwell v. Cape Cod Hospital* (1st Cir. 1994) 26 F.3d 254; *Harvey, supra*, 949 F.2d 1127; *Spencer v. Lee* (7th Cir. 1989) 864 F.2d 1376; *Janicsko v. Pellman* (M.D.Pa. 1991) 774 F.Supp. 331, affd. (3rd Cir. 1992) 970 F.2d 899.) Moreover, as these and other cases show, even if *Cummings* were persuasive authority, it represents a minority view on the issue whether private hospitals or physicians are

_____

[16] Julian also miscites *Doe v. Rosenberg, supra*, 996 F.Supp. 343 as having found state action, when in fact the court in that case did not. (See *id.* at pp. 349-358.)

55

state actors when they detain a person for mental health treatment pursuant to state law.  (See *McGugan v. Aldana-Bernier* (2d Cir. 2014) 752 F.3d 224; *Wittner v. Banner Health* (10th Cir. 2013) 720 F.3d 770; *Estades-Negroni v. CPC Hospital San Juan Capestrano* (1st Cir. 2005) 412 F.3d 1; *Benn*, *supra*, 371 F.3d 165; *Bass v. Parkwood Hospital* (5th Cir. 1999) 180 F.3d 234; *S.P. v. City of Takoma Park,* 134 F.3d 260 (4th Cir.1998); *Doe v. Rosenberg*, *supra*, 996 F.Supp. at p. 349 [collecting additional cases].)[17]

---

[17]     Numerous other federal courts of appeals and district courts have adopted this majority view.  (See, e.g., *Doe v. Rosenberg* (2d Cir. 1999) 166 F.3d 507; *Pino v. Higgs* (10th Cir. 1996) 75 F.3d 1461; *Ahearn v. Inland Hospital* (D.Me., Sept. 23, 2016, No. 1:16-CV-00457-DBH) 2016 WL 5338525; *Much v. Langston* (C.D.Cal., Apr. 28, 2016, No. CV 16-0863 VAP (SS)) 2016 WL 1732696; *Caldwell v. Gupta* (N.D.Ind., May 19, 2015, No. 2:15-CV-157 JD) 2015 WL 2381356; *Gordon v. Neugebauer* (N.D.Tex. 2014) 57 F.Supp.3d 766; *Antwi v. Montefiore Medical Center* (S.D.N.Y., Nov. 18, 2014, No. 14 Civ. 840 (ER)) 2014 WL 6481996; *Bayer v. Pocono Medical Center* (M.D.Pa., July 23, 2014, No. CIV.A. 3:13-1900) 2014 WL 3670499; *Zhuang v. Saquet* (D.Mass., June 20, 2014, No. CIV.A. No. 09-12163-NMG) 2014 WL 2810320; *Tate v. Kaiser Foundation Hospitals* (C.D.Cal., Jan. 15, 2014, No. 2:12-CV-9075-CAS (RZx)) 2014 WL 176625; *Sturm*, *supra*, 2010 WL 725563; *Hopkins v. Planich* (W.D.Wash., Nov. 9, 2009, No. C09-5405 FDB) 2009 WL 3765170; *Bolmer v. Oliveira* (D.Conn. 2008) 570 F.Supp.2d 301; *Nash v. Lewis* (D.Or., Dec. 21, 2004, No. Civ.04-6291-CO) 2004 WL 2966913; *Doe v. Harrison* (S.D.N.Y. 2003) 254 F.Supp.2d 338; *Hendricks v. Rasmussen* (D.Minn., July 27, 2001, No. Civ. 01-783(DSD/JMM)) 2001 WL 1631325.)  Such "'numerous and consistent'" federal court decisions are persuasive authority.  (*Morales v. 22nd District*

56

Thus, under any of the tests, Julian failed to allege facts showing the hospital defendants acted as state actors in deciding to detain, assess, and treat her. The trial court properly sustained the hospital defendants' demurrers to Julian's second cause of action without leave to amend.

## 2.     State Civil Rights Claim

Julian's third cause of action against the hospital defendants was for violation of civil rights under the California Constitution. As noted, there is no cause of action for damages for alleged violations of article I, section 2, subdivision (a) (freedom of speech), article I, section 3, subdivision (a) (right to petition the government), or article I, section 7, subdivision (a) (due process and equal protection), when such action is not tied to an established common law or statutory action, and Julian did not allege facts showing a violation of article I, section 3, subdivision (b), concerning her "right of access to information concerning the conduct of people's business." With regard to her claim under article I, section 1, for alleged violations of her right to privacy, Julian failed to identify a legally protected privacy interest, a reasonable expectation of privacy under the circumstances, or a serious invasion of the identified privacy interest. (See *Sheehan*, *supra*, 45 Cal.4th at p. 998; *Hill*, *supra*, 7 Cal.4th at pp. 35-37.)

With regard to her claim under article 1, section 13, for unreasonable search and seizure, California law, like federal law, requires state action, which is lacking here for the same reasons it is lacking under federal law. (See *Tate*, *supra*, 2014 WL

_____

*Agricultural Association* (2016) 1 Cal.App.5th 504, 516; see *Conrad v. Bank of America* (1996) 45 Cal.App.4th 133, 150.)

176625 at p. 4; *People v. De Juan* (1985) 171 Cal.App.3d 1110, 1120 [the "provisions prohibiting unreasonable searches and seizures found in both the federal and California Constitutions . . . are applicable only to searches and seizures by the government or its agents"].) Therefore, the trial court properly sustained the hospital defendants' demurrers to Julian's cause of action for violations of the California Constitution without leave to amend.

## DISPOSITION

The judgment is affirmed. Respondents are to recover their costs on appeal.


SEGAL, J.

We concur:


PERLUSS, P. J.


SMALL, J.*

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.